```
        IN THE UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF VIRGINIA
                 Big Stone Gap Division

-------------------------x
                         :
UNITED STATES OF AMERICA, :
                         :
       Plaintiff,        :
                         :
v.                       :   2:10CR16
                         :
STEPHANIE NEWTON, et al., :
                         :
       Defendants.       :   Big Stone Gap, Virginia
                         :   February 24, 2011
-------------------------x   9:05 a.m.

                    JURY TRIAL
          BEFORE THE HONORABLE JAMES P. JONES
        UNITED STATES DISTRICT JUDGE, and a jury.
```

APPEARANCES:

```
       ZACHARY T. LEE, Esquire
       Assistant U.S. Attorney
       180 West Main Street
       Abingdon, Virginia  24210

           For the United States of America.


       A. BENTON CHAFIN, JR., Esquire
       Chafin, Chafin & Ely
       P.O. Box 1210
       Lebanon, Virginia  24266
           Counsel for the Defendant Stephanie Newton.
       LOUIS DENE, Esquire
       P.O. Box 1135
       Abingdon, Virginia  24210
           Counsel for the Defendant Thelma Newton.
```

Proceedings recorded by Stenography, transcript produced by computer.

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 WEST MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628-5116**

```
1          (Proceedings commenced at 9:05 a.m.)

2          (Proceedings were had and reported, but not

3    transcribed.)

4          MR. LEE:  Thank you, Your Honor.  Ladies and

5    gentlemen, when we started voir dire earlier this morning

6    we heard a lot of references to St. Charles, Virginia.  I

7    don't know if you're familiar with St. Charles, Virginia at

8    all, but throughout the course of this trial you're going

9    to hear that St. Charles is a small community in Lee

10   County, Virginia.  There's pretty much one road in and one

11   road out.  A lot of poverty in St. Charles, Virginia.  But

12   more importantly, what you're going to hear is that St.

13   Charles is awash in prescription pain medications, cocaine,

14   and other drugs.  And you're going to hear at the center of

15   that drug distribution in St. Charles, Virginia is a family

16   with the last name of Newton:  Brothers, sisters,

17   daughters, aunts, cousins, the Newton family.

18        You'll hear that two defendants in this case,

19   Stephanie Newton, Thelma Newton Welch are part of that

20   family, and are also right in the middle of that drug

21   dealing that has taken over St. Charles.

22        The evidence you're going to hear in this case is that

23   these two defendants, along with Kenneth Newton, who is

24   Thelma's brother, biological brother, and Stephanie's

25   uncle, and other members of his drug trafficking
```

 1    organization distributed OxyContin, cocaine, Xanaxes and

 2    Lortabs in the St. Charles, Virginia area for approximately

 3    a year long time period, between approximately January 1st

 4    of 2009 until November of 2010.

 5         You're also going to hear that in order to further

 6    that drug dealing, and to keep the group of drug dealers

 7    going, there were attempts to subvert law enforcement's

 8    investigation and prosecution of that drug dealing network.

 9         Again, you're going to hear that these two defendants

10    were right in the middle of it.  Stephanie Newton, you'll

11    hear, has been an employee at the regional jail in

12    Duffield, Virginia for a number of years.  Up until

13    approximately September of 2009 she lived next door to

14    Thelma.  Now, they both lived in Pennington Gap.  They had

15    left St. Charles, but you'll hear that their relatives,

16    Kenneth, Michael Joe, and the other members of the drug

17    trafficking organization that was centered on the Newton

18    family remained in St. Charles.

19         The evidence you're going to hear is that in September

20    of 2009 Stephanie Newton came into a large sum of money,

21    approximately $100,000, from an insurance settlement

22    following a fire at her residence.  You'll hear that

23    Stephanie, her boyfriend at the time, James Crabtree, and

24    Kenneth Newton decided they were going to make an

25    investment of $25,000 of that $100,000, but instead of

1    investing in Merrill Lynch, or the stock market, or CDs at

2    a bank, they decided they were going to invest in drugs.

3        You'll hear that Stephanie gave $25,000 of that money

4    to James Crabtree, Ken Newton to drive to Ohio, buy cocaine

5    and OxyContin.  Thankfully, once they got back, very

6    shortly afterward, on October 15, 2009, it was two days

7    after they got back to St. Charles and started selling the

8    OxyContin they got busted.

9        A search warrant was executed at Kenneth Newton's

10   house and OxyContin, cocaine and over $1,000 in United

11   States currency was discovered.  You will continue to hear

12   that just because Ken and James got busted, the drug

13   trafficking continued in St. Charles, the same

14   organization.  You'll hear that other members of the

15   organization continued to sell OxyContin and other drugs in

16   the St. Charles area until February the third of 2010, when

17   an investigation led by Steven Levesque of the ATF, the Lee

18   County Sheriff's Department put together an indictment and

19   a number of search warrants to take down the Newton drug

20   trafficking organization that had been operating in St.

21   Charles.

22       Unfortunately, Stephanie Newton found out about it

23   before the search warrants were executed.  And what did she

24   do?  She notified all of her friends, all of her

25   compatriots.  She called Thelma.  Thelma put out the word,

 1    too.  And you'll hear that a number of these people that

 2    were supposed to be arrested, were supposed to have their

 3    houses searched at 6:00 in the morning got the call that

 4    night, hit the road.  No drugs were found, no people were

 5    found at a number of locations.  And you'll hear that that

 6    was done in order to prevent people from getting arrested,

 7    prevent evidence from being found, and to hamper a federal

 8    investigation.

 9         You're also going to hear that Ken Newton, to take you

10    back just a little bit to the search house in October, that

11    he's a multi time convicted felon but he had a couple

12    handguns in his house, and you're going to hear that one of

13    those handguns got turned over to law enforcement, and the

14    other one got stashed with a friend of his, and continuing

15    to try to help out the Newton organization you'll hear that

16    Stephanie Newton was relaying information, helping him hide

17    what law enforcement was looking for.

18         So, there are conversations with Ken Newton talking in

19    code about this handgun, where it is, how to find it.

20         Finally, ladies and gentlemen, we're here because in

21    March of 2010 Agent Levesque went to interview Stephanie

22    Newton about her knowledge of the federal investigation,

23    her knowledge of drug dealing, her knowledge of Kenneth

24    Newton's possession of firearms after being a convicted

25    felon, and you'll hear that she lied, flat out lied.  She

1   lied about knowing that her boyfriend was using drugs, even

2   though we have recorded phone conversations six months

3   previous where she's talking to Ken Newton about her

4   boyfriend using liquid morphine and being hooked on it.

5        You're going to hear that she lied about knowing where

6   this handgun was even though there's recorded conversations

7   of her and Ken Newton talking in code, and she lied about

8   tipping off the other people in the organization, even

9   though the phone records and testimony of the people she

10  tipped off proved differently.

11       Now, that's a summary of why you're here.  You're here

12  because there's a drug trafficking organization, and these

13  two women were a part of it.  And then you'll hear that

14  when things started to go bad for that information they

15  tried to do everything they could to stop it, and stop the

16  investigation, and stop their friends from getting arrested

17  and being prosecuted.

18       The defendants were charged with four counts.  Count

19  one was a drug trafficking conspiracy.  They're charged

20  with conspiring with each other, James Crabtree and others

21  to distribute and possess with the intent to distribute

22  cocaine, oxycodone, Xanax and Lortabs.

23       Count two of the indictment is a charge of obstruction

24  of justice, and in explaining what that charge is, the

25  defendants either obstructed justice or attempted to

1   obstruct justice, and of course that's referring to the

2   execution of the search warrants, the arrest of federal

3   defendants, and the prosecution of those defendants.

4       Count three of the indictment is a conspiracy to

5   obstruct justice.  That details the same activity, tipping

6   off defendants of a charge, tipping off people before

7   search warrants were executed.

8       And finally, count four of the indictment is that

9   Stephanie Newton made false statements in regard to a

10  federal investigation in March, 2010.  Now, you're going to

11  hear a lot of evidence over the next few days.  We'll try

12  to move along as fast as we can, but as you listen to the

13  evidence I encourage you to use your common sense about

14  what you hear.  You're going to hear a number of witnesses.

15  You're going to have a number of pictures.  You're going to

16  have all types of evidence to link together during this

17  trial.  And at the end of the evidence the judge is going

18  to instruct you as to what the law is that you apply to

19  determine the case.

20      I don't want to go through all that for you right now

21  because the judge will do a much better job, but just so

22  you have the frame work I want to hit each count of the

23  indictment so you know what to be looking for.

24      Count one of the indictment, as I said, is conspiracy

25  to distribute drugs.  For the Government to prove

1    conspiracy, the Government has to show that there was an

2    agreement between two or more people to engage in illegal

3    actions, in this case the distribution of OxyContin,

4    cocaine, Lortabs and Xanax.

5        The evidence you're going to hear about that

6    agreement, as I told you before, you're going to hear

7    Stephanie Newton gave $25,000 in cash to her boyfriend so

8    that he and Ken Newton could drive to Ohio and buy

9    OxyContin and cocaine to distribute in St. Charles.

10       You are going to hear the testimony of the people on

11   that trip; you're going to hear the testimony of law

12   enforcement officers, and the cocaine and the OxyContin.

13   So, that's your evidence that shows there was an agreement

14   between those people to distribute drugs.

15       Count two of the indictment, again, is the count of

16   obstruction of justice, and in essence what the Government

17   has to prove is that the defendants obstructed or attempted

18   to obstruct a proceeding of the federal government.  In

19   this case the evidence you're going to hear is that both

20   defendants made phone calls on February 3rd and

21   February 4th, people that they knew were drug dealing, that

22   they knew were being targeted by the federal authorities,

23   and told them you better watch out, there's a raid coming

24   to St. Charles at 6:00 a.m. tomorrow.  And you're going to

25   hear that, in fact, they obstructed justice.

1       You're going to hear that those defendants got out of

2  their homes so that when law enforcement showed up to

3  arrest them their homes were empty.  There was no evidence,

4  nobody to interview.  With a few of them it took a while to

5  find them.  So, that's your obstruction of justice to,

6  obstruct the arrest, the search warrants and ultimately the

7  federal prosecution of those defendants.

8       And you'll hear those defendants who received those

9  phone calls, and you'll see the phone records that

10  corroborate their testimony.

11       Count three, like I said, is a conspiracy to obstruct

12  justice.  In essence, the Government just has to show that

13  there was an agreement between two or more people to commit

14  the obstruction of justice, tipping off people, tipping off

15  of people.  And the evidence would be pretty much the same

16  as it was for count two.  It's the phone calls, the

17  testimony about people being tipped off, leaving their

18  homes.

19       Finally, count four, as I said, is the making a false

20  statement in regard to a federal investigation, or matter

21  under federal jurisdiction of the executive branch.  What

22  the Government has to show is that the defendant, Stephanie

23  Newton, made a false statement that was, was termed

24  material, which means important, and a matter within the

25  federal jurisdiction.

 1          To kind of make it a little clearer, what's charged in

 2     this case is that Stephanie Newton made a false statement

 3     in regard to the investigation of Ken Newton and the

 4     obstruction of justice, and her false statement was

 5     material, it was important to the investigation.

 6          The evidence you're going to hear is that Stephanie

 7     Newton, as I said, lied on multiple occasions to Steve

 8     Novak.  She denied that her boyfriend was using drugs and

 9     that she knew about it; she denied that she knew anything

10     about Ken Newton possessing firearms; and she denied that

11     she and Thelma obstructed justice.  And those statements,

12     they were important because what you're going to hear is

13     that Ken Newton was still being prosecuted at that time, a

14     felon in possession of a firearm.  You're going to hear

15     those statements were important because the ATF was

16     investigating obstruction of justice, who tipped off all

17     these people so when the tactical assault teams hit the

18     houses there was nobody there.  Who had done that?

19          So, ladies and gentlemen, that's the evidence you're

20     going to hear.  You're going to hear about Stephanie Newton

21     and Thelma Newton, right in the middle of that drug

22     trafficking organization.  They weren't the kingpins, but

23     they were right in the middle, doing whatever they could to

24     try to finance the operation, keep the operation running.

25          You're going to hear that they were distributing drugs

```
 1    on the side.  So, ladies and gentlemen, if you listen to
 2    the evidence, use your common sense -- you won't see a lot
 3    of witnesses up here.  Don't be surprised by what you see.
 4    I'm going to tell you, you're going to see a lot of drug
 5    dealers, you're going to see people with criminal records.
 6    They're going to be telling you what they've done in the
 7    past and why they're here.  Just remember, you listen to
 8    that testimony and think about those witnesses, and who
 9    chose them.  The evidence will be that these defendants,
10    they chose to associate with them, to be their friends, and
11    more importantly to be in business with them.
12         Ladies and gentlemen, after considering all of the
13    evidence in this case, it will be clear to you that both
14    defendants are guilty, and I'll ask you to find that way.
15    Thank you.
16              THE COURT:  Thank you, Mr. Lee.  Mr. Chafin?
17              MR. CHAFIN:  Thank you, Judge.  May it please the
18    court, and ladies and gentlemen of the jury, thank you for
19    your attention.  As I listened to Mr. Lee's opening
20    statement I felt like we were talking about two different
21    cases, and when you hear the evidence from the defense,
22    when you hear the cross examination of these kingpins, we
23    believe you'll see what I'm talking about.
24         There's an old adage that the, that I've heard all my
25    life, you probably heard, too, and it's certain, but you
```

1    don't get to pick your family.  When you're born into this

2    world you just come into it, and whoever your family

3    members are, they're your family members, and you've got to

4    make the best of it, and you have to deal with it.

5         And you'll hear in this case, you'll hear evidence

6    that my client, Stephanie Newton, was born into a family

7    where her brothers just were no good.  You'll hear that.

8    They just have been drug addicts, ne'er do wells, no good

9    their whole lives.

10        On the other hand, you'll hear that Stephanie here,

11   who is 30 years old, has from the time she went to school,

12   got a job, became a nurse, worked a full time position,

13   worked several years as the, in an effort to pay her bills

14   and support her family just like, just like the American

15   dream.

16        Now, unlike her, as I said, there are these other

17   members of her family -- and she doesn't live in St.

18   Charles -- Thelma Welch didn't work in St. Charles, either.

19   These other family members are out there, and Mr. Lee and

20   the Government gets it right in part.  They've prosecuted

21   those two individuals, and those individuals have pleaded

22   guilty, and they're serving lengthy penitentiary sentences

23   in the federal Bureau of Prisons right now as we speak.

24   So, they've gotten a piece of justice, and they're

25   earnestly, the evidence will show, they're earnestly having

1   to pay a price for their sorry state and the way they've

2   been living their lives.

3       And we think that the evidence will show that they're

4   not satisfied with that.  Quite honestly, they're not

5   satisfied with the length of the sentences that they're

6   serving, and they'd like a another shot at it.  They've

7   lied to come back before this court, after they come in

8   here and try to tell everything about other people.  They

9   want to come back and get a chance at being resentenced or

10  getting their sentences reduced.  You'll have to ask

11  yourselves as you hear their testimony, do they have a

12  motive to lie?  What would they gain?  We believe that

13  there is clearly a motive on their part, and on people in

14  general to lie.  When you look at those individuals, we

15  don't think the evidence will show that you can believe a

16  thing about it.

17      I know you're going to hear about how they're

18  convicted felons, how they've been convicted felons for

19  years and years and years, and just live this life.  Well,

20  that's not the life that Stephanie has been living.

21  Regardless of what the Government wants to come up with in

22  an indictment, in a charge, in the, that's all it is,

23  that's all it is.

24      When you hear this evidence, ladies and gentlemen, I

25  want you to look for clues, I want you to look for clues.

1   I think people in general, I think people in general, we

2   all possess an uncanny ability to tell the truth, and to

3   discern it from people, and we see clues from people when

4   they testify or when they get on the stand, even though

5   they've well prepared for it, you'll see clues, we believe

6   that, they're in here to tell you a bunch of hokey pokey,

7   okay?

8        And we want you to hold true to that promise that you

9   made.  You promised to give Stephanie Newton a fair trial.

10  This is the biggest day of her life.  She's 30 years old,

11  and the evidence will show that she's never, she has never

12  lived this way, never been in trouble, this kind of

13  trouble, never been in trouble, never been before a jury

14  like this.  This is a big day for her.  So, we've got to

15  hold you true to your promise.  I accepted it from you, and

16  I want to hold you to it.

17       When you hear all this evidence, ladies and gentlemen,

18  the vast majority of the witnesses that you're going to

19  hear are going to be those types of individuals that I've

20  talked to, that I've talked about.

21       But Mr. Lee made reference, and I'll mention, too, the

22  evidence that he talks about, about my client worked at the

23  jail.  She knew they taped the recordings.  It wasn't

24  something she'd likely forget.  So, bear in mind as you

25  hear this evidence.  She worked there, she couldn't help

```
 1   people calling her.  You take calls, you have your family

 2   members that are in trouble, they're not just in trouble,

 3   here was something that just went on for a year, there was

 4   this conspiracy for a year, as Mr. Lee told you.  The

 5   evidence will be these people had been doing it forever.

 6   But not these people.  But those people had been doing this

 7   all along.  You have to understand when you leave it's hard

 8   to divorce yourself from your family.  When you hear all

 9   this evidence I'm confident that you'll deliver a verdict

10   for Stephanie Newton.  I'm confident when you hear it

11   you'll understand she's been doing the right thing in life,

12   and while you might say, and we may all say when we hear

13   the evidence that she may have made a mistake or two along

14   the way, who has not?  Who has not made a mistake along the

15   way?  The mistakes that you hear about, it might be bad

16   judgment, might be situations where if she had to do over

17   again, I think you'll hear evidence it would have been done

18   differently.  But not crimes, not a crime, not something

19   that she could, could be convicted of a federal offense

20   for, and sentenced, and put away from her possessions and

21   put away from her career.  There's two sides to every

22   story.  Even the flattest pancake, when you flip it over,

23   has got a another side.

24        So, listen to this evidence very carefully.  Listen

25   for those clues.  Listen for those clues, and who would
```

 1    have a reason to not tell the truth.  Thank you.

 2              THE COURT:  Thank you, Mr. Chafin.  Mr. Dene?

 3              MR. DENE:  In the beginning of this trial a few

 4    minutes ago when we were questioning the jury, voir diring

 5    the jury, I made a statement to the effect that what counts

 6    is what comes from this chair up here, and what the court

 7    introduces into evidence.

 8        My client and her sister have been indicted by the

 9    federal court, and federal court has issued those

10    indictments where they have been charged for certain

11    crimes.  The test that the government must prove is to

12    prove that they committed those crimes.  Until they can

13    prove such crimes, these ladies are innocent.

14        You heard Mr. Lee talk and tell you what they were

15    going to prove.  We ask you to listen carefully to what

16    they prove from this witness stand up here, and see the

17    nature of the people where that evidence comes from, and

18    then we will ask you, if it becomes necessary, to listen to

19    what our clients might have to say in the event if we

20    decided to put them on as witnesses.

21        Now, people near them, brothers near them, that

22    doesn't rub off on them.  The records will show that they

23    both have clean, clear records.  And in my client's case

24    she has not worked, she's disabled, she's babysitting her

25    sister's four children, and in that position she has

```
 1    maintained a very, very clean record.  And in that respect
 2    we will ask you to listen extremely carefully to the
 3    testimony, evidence that they put on that is testimony that
 4    is sufficient to convict these ladies.
 5         We will tell you that after you hear the evidence from
 6    the Government, listening very carefully to what this
 7    evidence comes from, it doesn't compare what we, we have to
 8    offer you, and let's make a decision on that.  Thank you,
 9    very much.
10              THE COURT:  Thank you, Mr. Dene.  Mr. Lee, you
11    may call your first witness.
12              MR. LEE:  The Government calls Emily Henion.
13         EMILY HENION, GOVERNMENT'S WITNESS, SWORN
14                    DIRECT EXAMINATION
15    BY MR. LEE
16    Q    Ma'am, would you please introduce yourself to the
17    jury?
18    A    My name is Emily Henion.
19    Q    How do you spell your last name?
20    A    H-E-N-I-O-N.
21    Q    Where are you employed?
22    A    AT&T.
23    Q    Ms. Henion, you have been asked to bring with you
24    certain records pursuant to a subpoena previously issued,
25    correct?
```

Henion - Direct

1    A     Yes.

2    Q     Is that subpoena originally issued to Alltel

3    Communications?

4    A     Yes.

5    Q     Did AT&T buy Alltel?

6    A     Yes.

7            MR. LEE:  If I may approach the witness, Your

8    Honor?

9            THE COURT:  Okay.

10   BY MR. LEE:

11   Q     I'm going to ask you what has been marked as

12   Government's Exhibit Eight, if you can just look through

13   that.  Are those the records that you produced?

14   A     Yes.

15   Q     Are those records kept within the normal course of

16   business of Alltel and AT&T?

17   A     Yes.

18   Q     What type of records are they?

19   A     Phone calls between two people, and it tells who made

20   the call, the call it was made to, the dial calls, date,

21   and how many minutes it was made for.

22   Q     And ma'am, specifically were you asked in regard to

23   two different phone numbers to produce information about

24   incoming and outgoing phone calls between 12:00 p.m. on

25   February 2, 2010 and 12:00 p.m. on February 5, 2010,

Henion – Direct

1  correct?

2  A    Yes.

3           MR. LEE:  Move for the admission of Government's

4  Exhibit Eight, Your Honor.

5           THE COURT:  It will be admitted.

6      (Government's Exhibit No. 8 was received in evidence.)

7  BY MR. LEE:

8  Q    And just to, I think there's a screen right in front

9  of you, that's the first page of that document, correct?

10 A    Yes.

11 Q    And I don't think the pointer screen works, does it.

12 All right.  Well, I'll just use my pen.  Apparently some

13 of the technical things aren't working here properly.  The

14 point here at the edge of my pen, that's the originator?

15 A    Yes.

16 Q    What does that mean?

17 A    That's the number that called, that the incoming call

18 was from.

19 Q    So, that would be a call coming into a certain

20 number, correct?

21 A    Yes.

22 Q    And that number would be?

23 A    (276)219-6971.

24 Q    Okay.  So, if there's a number in the originator

25 column, that means that this number dialed 219-6971?

1   A    Yes.

2   Q    There's a number in this dialed column, is the

3   outgoing number that was dialed by 219-6971?

4   A    Yes, that's correct.

5   Q    Then you mention it's got a start date and end date?

6   A    Yes.

7   Q    Is this column the time of the call?

8   A    Yes.

9   Q    You said starting time and ending time?

10  A    Yes.

11  Q    In the duration column, what does that indicate?

12  A    How many minutes were, the duration of the call, how

13  many minutes they were on the phone.

14  Q    So, it's one, that's one minute, two, two minutes,

15  and so on?

16  A    Yes.

17  Q    Okay.  Thank you, ma'am.

18           MR. LEE:  I don't have any further questions.

19  Please answer any questions of defense counsel.

20                    CROSS EXAMINATION

21  BY MR. CHAFIN

22  Q    Good afternoon, Ms. Henion.

23  A    Good afternoon.

24  Q    Ms. Henion, you have told us that these are Alltel

25  records, correct?

Henion – Direct/Cross

1    A     Correct.

2    Q     I don't guess you have any way of knowing who

3    actually uses these telephones, do you?

4    A     No.

5    Q     That's not possible, is it?

6    A     No.

7    Q     From a records standpoint, is it?  And as far as the

8    length of a telephone call, you can't really tell us that,

9    either, can you, the duration, the exact duration?

10   A     It rounds up.

11   Q     It rounds up?

12   A     Yeah.

13   Q     So --

14   A     So, if they were on the phone for 30 seconds, it

15   would be one minute.

16   Q     Wouldn't it be true, ma'am, that if you have some

17   type of feature on your telephone like something that says

18   please enjoy the music while your party is reached, all

19   that is using up your time, too, isn't it?

20   A     Depends on who is calling.

21   Q     Does that feature actually cost a minute?

22   A     Yes.

23   Q     So, if you had that feature on your phone, like

24   please enjoy the music while your party is reached, and

25   then you hear the music, you've spent a minute and you

1   might not talk to anybody, right?

2   A    Correct, yes.

3   Q    And if you never reach anybody, let's just say you

4   just dial, and it rings, and rings, and rings, and rings,

5   you've spent a minute, haven't you?

6   A    Yes.

7   Q    It doesn't round up then, does it?

8   A    Well, yeah, that's correct.

9   Q    The first thing is a minute, the minute you push the

10  button.  So, these things that say one, over here in the

11  duration, one, one, one, one, any number of those could

12  have been no party reached, couldn't they?

13  A    Correct.

14  Q    And the ones that say two, two minutes, that could

15  still be no party reached, couldn't it?

16  A    Correct, if they left a voice mail.

17  Q    There's just no way of knowing from these records

18  whether or not?

19  A    Yes.

20  Q    When you get to a 14 minute call, somebody has been

21  doing some jawing on that call, they've been talking?

22  A    Yes.

23  Q    A six minute call, eight minute call, but these one

24  and two minute calls are really suspect, whether anybody

25  really talked, aren't they?

1  A     Correct.

2  Q     Thank you, ma'am.

3                    CROSS EXAMINATION

4  BY MR. DENE:

5  Q     In the seconds column of that document, that shows

6  calls that were made by the person with telephones?

7  A     Correct.

8  Q     It shows the date those phone calls were made?

9  A     Yes.

10  Q     Is that correct?

11  A     Yes.

12  Q     And it also puts that down in military time?

13  A     Yes.

14  Q     In other words, if it was 1:00, it would be 1300

15  hours on here; is that correct?

16  A     Correct.

17  Q     And then it would show when the calls terminated,

18  correct?  If you had, starting at, say, 1300 hours, and it

19  shows 1344, that means you would have had a 44 minute

20  telephone call; is that correct?

21  A     Yes.

22  Q     And the last column shows that, you've got a two, and

23  then it shows incoming.  That means there's a two minute

24  incoming call, in the far left hand corner to the one in

25  the third column; is that correct?

Henion - Cross

```
 1   A     Correct.
 2   Q     Now, when does that time start on the telephone call?
 3   In other words, when you pick up the receiver or you get,
 4   hit the on button?
 5   A     When you push end.
 6   Q     When you push it down?
 7   A     Yeah.
 8   Q     When does it cut off?
 9   A     When you push end.
10   Q     To this system here did you have a recording device?
11   A     As in voice mail?
12   Q     Right.
13   A     Yes.
14   Q     If the voice mail or recording device comes on, the
15   person who is calling into that number leaves it on for a
16   few minutes, that will go into the amount of time you
17   call; is that correct?
18   A     Yes.
19   Q     Do you have any way of knowing from this record
20   whether or not any of these calls --
21   A     No.
22   Q     This system has no way of determining who accepts
23   calls; is that true?
24   A     No.
25   Q     Just stores the telephone numbers?
```

Henion – Cross

```
 1   A     Correct.

 2              MR. DENE:  That's all I have.

 3              THE COURT:  Thank you, Mr. Dene.  Any further

 4   questions of the witness?

 5              MR. LEE:  No, Your Honor.  May this witness be

 6   released?

 7              THE COURT:  Without objection.

 8              MR. CHAFIN:  Without objection.

 9              THE COURT:  Thank you, ma'am.  You may step down

10   and you may leave.  You're released.  You may call your

11   next witness.

12              MR. LEE:  Dave Franks.

13        DAVE FRANKS, GOVERNMENT'S WITNESS, SWORN

14                   DIRECT EXAMINATION

15   BY MR. LEE:

16   Q     Sir, would you please introduce yourself to the

17   members of the jury?

18   A     My name is David Franks.

19   Q     Where are you employed?

20   A     I'm employed with Nationwide Insurance Company.

21   Q     How long have you been there?

22   A     I've been there a little over seven years.

23   Q     What's your position?

24   A     I am a 1arge loss property adjuster.

25   Q     If you would tell the members of the jury what that
```

1    means?

2    A    I only work major fire claims for home owners.

3    Q    When you say you work fire claims, does that mean you

4    assist the home owner in getting paid for their loss, and

5    helping them out for the troubled times?

6    A    Yes, sir.  I assess their damages, get them paid for

7    whatever structure damage they have, additional living

8    expenses.

9    Q    During your employment with Nationwide did you have

10   an opportunity to work with Stephanie Newton?

11   A    I did.

12   Q    Was that for a fire that occurred in Pennington Gap?

13   A    It was.

14   Q    Is she in the courtroom today?

15   A    Yes, she is.

16   Q    Would you please identify her?

17   A    Ms. Newton.

18   Q    What's she wearing?

19   A    What is she wearing?

20   Q    Yes.

21   A    Blue/green sweater, white shirt, gray slacks.

22   Q    Sitting one person in on counsel table there?

23   A    Second person over from me.

24        MR. LEE:  I'd ask the record reflect the witness

25   identified the defendant.

Franks – Direct

```
 1              THE COURT:  It will so reflect.
 2   BY MR. LEE:
 3   Q    Did you assist her for a claim on a fire that
 4   occurred on September 19, 2009?
 5   A    I did.
 6   Q    And during your assistance of her did Nationwide make
 7   certain payments to Ms. Newton for her loss?
 8   A    Yes, we did.
 9   Q    I'll show you what has been marked as Government's
10   Exhibits One through Five, and actually I'll show defense
11   counsel first.  I'm going to hand you now what's been
12   marked as Government's Exhibits One through Five, if you
13   could look at those.
14   A    Okay.
15   Q    Do you recognize what those are?
16   A    Those, those are checks that I wrote to Ms. Newton.
17              MR. LEE:  I'd move for the admission of
18   Government's Exhibit --
19   BY MR. LEE:
20   Q    Just to be clear, they're copies of front and back of
21   checks to Mrs. Newton, correct?
22   A    Yes, sir.
23              MR. LEE:  I move for admission of Government's
24   Exhibits One through Five, Your Honor.
25              THE COURT:  They will be admitted.
```

1      (Government's Exhibit Nos. 1 through 5 were received

2   in evidence.)

3   BY MR. LEE:

4   Q    I'll put these on the screen here.  The first check,

5   Government's Exhibit One, was written on September 21,

6   2009 in the amount of $3,000; is that correct?

7   A    Yes, sir.

8   Q    Government's Exhibit Two was also written to Mrs.

9   Newton on September 21, 2009?

10   A    Yes, sir.

11   Q    Government's Exhibit Three was written on

12   September 30, 2009 to Ms. Newton, and that was written for

13   $62,751.49?

14   A    Yes, sir, that's correct.

15   Q    Government's Exhibit Four is another check written to

16   Stephanie Newton on September 30, 2009, it was written in

17   the amount of $22,688.26; is that correct?

18   A    Yes, it is.

19   Q    Finally, Government's Exhibit Five is a check written

20   on October 22, 2009 in the amount of $9,093.62?

21   A    That is correct.

22   Q    Mr. Franks, are there, in essence, two different

23   options that a home owner can take when Nationwide has a

24   claim such as this as far as receiving cash or receiving a

25   new house?  What were the different options?

Franks – Direct/Cross

```
 1   A    What our obligation is is to assess the damages, and
 2   make payment for those damages.  Sometimes it is to
 3   replace the entire home; sometimes it's to repair the
 4   home.  Once we have written the check to the householder
 5   and any applicable third parties, it's up to the
 6   policyholder and the third parties to work out whatever
 7   they want to pursue.
 8   Q    When you approached Ms. Newton about taking care of
 9   her loss, was the only option for her to get this large
10   amount of money in checks, or would Nationwide take care
11   of setting up contractors?
12   A    We would have assisted her.
13   Q    Instead, she chose to get these five checks for all
14   that money?
15   A    Yes, sir.
16          MR. LEE:  No further questions, Your Honor.
17          THE COURT:  All right.  Cross examination?
18                 CROSS EXAMINATION
19   BY MR. CHAFIN:
20   Q    Good afternoon, Mr. Franks.
21   A    Good afternoon.
22   Q    I'm Ben Chafin.  I represent Stephanie Newton.  And I
23   take it you've been adjusting claims for seven years for
24   Nationwide, as you say?
25   A    Yes, sir.
```

Franks – Direct/Cross

1   Q    I guess you've seen a lot of houses go up in smoke?

2   A    I have.

3   Q    And that, indeed, is what happened to this one, isn't

4   it?

5   A    It is.

6   Q    And these checks that you wrote, they were written

7   for payment of things that were things that were destroyed

8   in the fire, correct?

9   A    That is correct, yes.

10  Q    But one of the checks I notice, the larger check, is,

11  if I may, I notice when I look at that check that it's

12  made out to, and this is Government's Exhibit Number

13  Three, I notice that it's made out to Stephanie Newton and

14  Farmers & Miners Bank?

15  A    Yes, sir.

16  Q    That would be because Stephanie Newton didn't own the

17  house outright; she owed money against it?

18  A    She had a mortgage with Farmer & Miners.

19  Q    She had a mortgage or deed of trust against the

20  property?

21  A    Yes.

22  Q    And so Farmers & Miners Bank was going to get some of

23  this money, correct?

24  A    Yes, sir.

25  Q    And that's why you made that check out that way?

Franks – Cross

1    A    Yes, sir.

2    Q    And this home that burned, did you have to look at

3    how it was titled, how the deed was titled?

4    A    On our insurance notice of loss it reports interested

5    third parties which would be mortgage companies or

6    sometimes relatives that have an interest in the property,

7    as well.  And Farmers & Miners Bank was on our notice of

8    loss, so I contacted the bank and verified the mortgage

9    with them, and they verified that they did have a mortgage

10   on that property.

11   Q    Do you remember how long Ms. Newton had been a

12   policyholder of Nationwide?

13   A    I don't recall, sir.

14   Q    Was Ms. Newton cooperative with you?

15   A    She was.

16   Q    And how long did it take you to make a decision to

17   pay this claim?

18   A    Most likely the decision would have been made soon

19   after or before the day that check was wrote for the

20   sixty-two thousand.

21   Q    Do you recall what the date of the loss was?

22   A    I believe it was September 19th.

23   Q    That's on the check, isn't it?

24   A    Yes, sir.

25   Q    And so the loss date there, September 19th, and you

1   delivered service to her within 11 days; is that right?

2   A    That's right, yes, sir.

3   Q    Thank you, sir.

4           THE COURT:  Do you have any other questions?

5           MR. DENE:  I have no questions, Your Honor.

6           THE COURT:  Thank you.  Thank you, sir.

7           MR. LEE:  May this witness be released, Your

8   Honor?

9           THE COURT:  Without objection, you may leave,

10  sir.  Thank you, very much.  You're discharged.

11          MR. LEE:  Government calls Michael Joe Newton.

12      MICHAEL J. NEWTON, GOVERNMENT'S WITNESS, SWORN

13                  DIRECT EXAMINATION

14  BY MR. LEE:

15  Q    Good afternoon.

16  A    Hello.

17  Q    Please introduce yourself to the members of the jury.

18  A    I'm Michael Joe Newton.

19  Q    Mr. Newton, you're a resident of St. Charles?

20  A    Yes, sir.

21  Q    How long have you been a resident of St. Charles?

22  A    All my life except when I was in prison.

23  Q    Family live in St. Charles?

24  A    They did when I was younger.  When my sisters married

25  and stuff they moved away.

M. Newton - Direct

```
1   Q    Who are your sisters?

2   A    Thelma Welch --

3   Q    Thelma Newton Welch, is she in the courtroom today?

4   A    Yes.

5            MR. LEE:  I'd ask the record reflect he's

6   identified the defendant, Thelma Newton Welch.

7            THE WITNESS:  Yes.

8   BY MR. LEE:

9   Q    You mentioned Stephanie is your adopted sister?

10  A    Yes.

11  Q    She in the courtroom today?

12  A    Yes, sir.

13  Q    Is she seated between the two gentlemen there?

14  A    Yes, sir.

15           MR. LEE:  I'd ask the record reflect the witness

16  identified the defendant, Stephanie Newton.

17  BY MR. LEE:

18  Q    You mentioned she was your adopted sister.  How did

19  that work?

20  A    My younger sister had a baby when she was pretty

21  young, and my parents took care of her.

22  Q    Is that Stephanie?

23  A    Yes, sir.

24  Q    But she was really your niece, but because she was

25  adopted by your parents she became your adopted sister?
```

M. Newton – Direct

```
1   A      Yes.

2   Q      Do you have brothers?

3   A      Yes.

4   Q      What are their names?

5   A      Gerald Newton, my oldest brother, Paul Newton and

6   Kenneth Newton and Darryl Newton, and I had a little

7   brother.  He passed away.

8   Q      Is it fair to say you and your brothers have had run

9   ins with the law the last years?

10  A      Three of them here.

11  Q      Which ones?

12  A      That would be Paul.

13  Q      Mr. Newton, if you would, it's a little hard to hear

14  in here, if you'd face the jury when you're talking.  What

15  are the three names of your brothers that have been in

16  trouble?

17  A      Darryl Newton, and Paul Newton, and Kenneth Newton.

18  Q      Is it fair to say most of their troubles have dealt

19  with drugs?

20  A      Yes, sir.

21  Q      Your troubles have dealt with drugs also?

22  A      Yes, sir.

23  Q      Mentioned you've been in prison a couple of times?

24  A      Yes, sir.

25  Q      Fair to say all of your felony convictions deal with
```

M. Newton – Direct

1   distribution or possession of drugs?

2   A     Yes, sir.

3   Q     You were convicted of distributing marijuana back in

4   1997 in Kentucky?

5   A     Yes, sir.

6   Q     You've also been convicted in this court in 2001 for

7   distribution of controlled substances?

8   A     Yes, sir.

9   Q     You're currently on probation for that, aren't you?

10  A     Yes, sir.

11  Q     The probation officer just upstairs?

12  A     Yes, sir.

13  Q     And finally, you've also got three convictions for

14  the distribution of cocaine from the State of Virginia

15  back in 1989?

16  A     Yes, sir.

17  Q     Those convictions have all led to you going to prison

18  for different periods of time?

19  A     Yes.

20  Q     You don't hide the fact that you've been in trouble?

21  A     Excuse me?

22  Q     Are not hiding the fact, and never have hidden the

23  fact that you've been in trouble?

24  A     No.

25  Q     You said that your family lived in St. Charles, you

M. Newton – Direct

1    grew up there, right?

2    A     Yes, sir.

3    Q     In fact, Ken Newton lived there up until recently,

4    didn't he?

5    A     Yes, sir.

6    Q     Where did he live in St. Charles?

7    A     My dad's old home place.

8    Q     If you would, tell the jury a little bit about St.

9    Charles.  Where is it?

10   A     It's a little old bitty town in Southwest Virginia.

11   There ain't no stores or nothing in it no more.

12   Q     Are there a lot of rich people in St. Charles?

13   A     No.  They're all pretty poor.

14   Q     Any jobs in St. Charles?

15   A     No, sir.

16   Q     A lot of people on drugs in St. Charles?

17   A     A lot of people have done that, drinking and drugs.

18   Q     Drinking and drugs.  Where did Ken live, where was

19   your old home place in St. Charles?

20   A     It's about half a mile past town.

21   Q     People live with him there?

22   A     He had girlfriends sometimes.

23   Q     Did you stay there occasionally?

24   A     Every once in a while I'd go up there, but I didn't

25   stay.

M. Newton - Direct

1   Q     And you said that the rest of your family moved out

2   and moved to Pennington?

3   A     Yes, sir.

4   Q     Pennington Gap, that is also in Lee County?

5   A     Yes, sir.

6   Q     Which members of your family lived in Pennington?

7   A     Thelma Welch moved to Pennington, and my mother and

8   dad, they got along better when they wasn't living

9   together all the time, so she moved to Pennington, too,

10  and Stephanie lived there when she first moved down there.

11  She was young, going to school.

12  Q     Now, you lived with Thelma for a while?

13  A     Yes.

14  Q     You also lived with Stephanie for a while?

15  A     Yes, sir.

16  Q     You lived with both of them back in 2009?

17  A     In 2007 with Stephanie, and 2009 I stayed with

18  Thelma.

19  Q     Now, at some point in time you and Stephanie entered

20  into an agreement to sell a house that you owned?

21  A     Yes, sir.

22  Q     Do you remember when that was?

23  A     It was probably May last year.

24  Q     May of last year?

25  A     Yes, sir.

M. Newton – Direct

1    Q    If you would, tell the members of the jury how you

2    went through those negotiations and what ended up

3    happening.

4    A    Well, she couldn't pay a whole lot to me because she

5    had to borrow some money from the bank to pay me $7,800

6    down.

7    Q    All right.

8    A    And then she was supposed to make payments, but a few

9    months later her house burned and she paid me off.

10   Q    And how did the payment, the pay off amount, how much

11   did she owe you at that point?

12   A    $11,800.

13   Q    $11,800?

14   A    Yes, sir.

15   Q    If you would, tell the members of the jury how the

16   pay off occurred, what she paid, who was there.

17   A    I was at my sister Thelma's house, and she said she

18   was going to the bank because the insurance check cleared,

19   and she paid me in cash.

20   Q    Do you remember when that was?

21   A    It might have been around September.

22   Q    Do you remember when your brother, Ken, was arrested

23   by federal authorities after a search warrant on his house

24   in October?

25   A    Yes, sir.

M. Newton – Direct

```
 1   Q    In relation to that date how many weeks before that
 2   did you get paid off by Stephanie?
 3   A    Probably just two or three weeks.
 4   Q    And you said she paid you $11,500?
 5   A    Yes, sir.
 6   Q    Or $11,800, excuse me?
 7   A    Yes.
 8   Q    Did she pay you in check or in cash?
 9   A    Cash.
10   Q    What else happened when she paid you?
11   A    James Crabtree had a big envelope full of money, and
12   he showed it to me, and he looked, he looked at mine and
13   said, "You want to trade," and he laughed and said, "No."
14   Q    Who was James Crabtree?
15   A    Stephanie's boyfriend.
16   Q    In October of 2009 he was her boyfriend?
17   A    Yes.
18   Q    When did they get married?
19   A    I ain't sure the date they got married.  He done got
20   in some trouble, he was out of jail on bond, and I believe
21   that's when they got married.
22   Q    So, the same time she paid you $11,800 in cash, she
23   gave James a bigger envelope full of money than you got?
24   A    He had it when they came back from the bank.
25   Q    Did he tell you what he was going to do with it?
```

M. Newton – Direct/Cross

```
1   A     No, he didn't tell me.

2   Q     Did you see him after that?

3   A     I didn't see him after that until he got busted at my

4   brother's.

5   Q     Okay.

6               MR. LEE:  No further questions, Your Honor.

7               THE COURT:  Cross examination?

8                       CROSS EXAMINATION

9   BY MR. DENE:

10  Q     Mr. Newton, my name is Lou Dene and I'm representing

11  your sister, Thelma.  I'm not sure I got all of your

12  brothers' names.  Could you tell me what their names were?

13  A     Gerald Newton was my oldest brother, and Paul Eddie

14  Newton, and Kenneth Newton, and Darryl Newton.

15  Q     Do you have any other sisters besides Thelma?

16  A     I have one other sister, Alice.

17  Q     Are they in the area, or are they somewhere else?

18  A     She stays in Knoxville with her boyfriend.

19  Q     I think you testified that you have been in the

20  penitentiary two different times?

21  A     Yes, sir.

22  Q     When did you go to the penitentiary the first time?

23  A     1989.

24  Q     How much time did you serve on that?

25  A     Five years.
```

M. Newton – Cross

1    Q    And the second time you came back out and you went
2    back again; is that correct?
3    A    Yes, sir.
4    Q    And how long were you out the second time, I'm sorry,
5    how long were you out before you got reincarcerated or
6    violated the law again?
7    A    I got out in 1993, and I went back to prison, well, I
8    was arrested in 2000.
9    Q    The most recent release is what date?
10   A    2007.
11   Q    And you're currently on probation or supervised
12   release?
13   A    Yes, sir.
14   Q    And you have not violated the law since then?
15   A    I got a DUI.
16   Q    You got a DUI and you reported it to your probation
17   officer?
18   A    Yes, sir.
19   Q    Now, your sisters over here, Thelma and Stephanie, to
20   your knowledge have they ever had any violations of the
21   law?
22   A    I don't think they ever have.
23   Q    Do you recall any, any at all?
24   A    No.
25   Q    They both have a clean record?

M. Newton - Cross

```
 1   A    I think so.  I ain't never knowed of them having

 2   tickets, or nothing.

 3             MR. DENE:  I think that's all I have at this

 4   time.  I would like to reserve the right to recall him

 5   because there might be some other instances where he comes

 6   up with regard to other witnesses.

 7             THE COURT:  Well, do you have him under subpoena,

 8   Mr. Dene?  The Government is the only one that has him

 9   under subpoena?  Well -- do you have any questions?

10             MR. CHAFIN:  I believe I do, Judge.

11             THE COURT:  All right.  Go ahead.

12                     CROSS EXAMINATION

13   BY MR. CHAFIN:

14   Q    Good afternoon, Mr. Newton.  I'm Ben Chafin, and I

15   represent Stephanie Newton.  Not all your family has had

16   these difficulties with drugs, have they?

17   A    Just me and my brothers.

18   Q    Not even all your brothers, have they?

19   A    No, my oldest brother ain't never been in trouble.

20   Q    Where does he live?

21   A    I lives in Woodway, which is right about Dryden,

22   Virginia.

23   Q    And you, you would agree that when you got out of

24   prison this last time you had to have somewhere to live,

25   didn't you?
```

1    A     Yes, I did.

2    Q     And it had to be somewhere that the probation office

3    of this court would approve of?

4    A     Yes, sir.

5    Q     And did your sister, Stephanie Newton, agree and

6    allow you to move into her home to help you out?

7    A     Yes.

8    Q     And you lived there?

9    A     Yes.

10   Q     But you all didn't get along too good, did you?

11   A     No, sometimes we didn't get along good.

12   Q     Why didn't you get along good?

13   A     Because I'd drink and run around with women they

14   didn't like.

15   Q     And in fact, didn't Stephanie Newton even call up

16   your probation officer and tell on you?

17            MR. LEE:  Objection, Your Honor.  This would go

18   to character evidence the court discussed earlier --

19            THE COURT:  I'll sustain the objection.

20   BY MR. CHAFIN:

21   Q     Mr. Newton, you, you've known Stephanie Newton all

22   your life?

23   A     Yes.

24   Q     And have you ever known her to have any dealings with

25   or involvement with illegal drugs?

M. Newton – Cross/Kiser – Direct

```
 1    A    I personally don't know nothing about none of it.
 2    Q    And you mentioned that your father and your mother,
 3    that they had moved, they moved to Pennington or
 4    something?
 5    A    My mother did, but my dad stayed in St. Charles.
 6    Q    This house that burned, was this a house that your
 7    father had given to Stephanie?
 8    A    He bought it for my mother and Stephanie, I think.
 9              MR. CHAFIN:  Thank you, sir.
10              THE COURT:  Any further questions, Mr. Lee?
11              MR. LEE:  No, Your Honor.
12              THE COURT:  All right.  Mr. Newton, if you'll
13    wait outside, please.  You're still under subpoena.  You
14    may call your next witness.
15              MR. LEE:  The Government calls Sheila Kiser.
16         SHEILA KISER, GOVERNMENT'S WITNESS, SWORN
17                    DIRECT EXAMINATION
18    BY MR. LEE
19    Q    Good afternoon.
20    A    Hi.
21    Q    Please introduce yourself to the members of the jury.
22    A    My name is Sheila Kiser.
23    Q    How do you spell your last name?
24    A    K-I-S-E-R.
25    Q    I don't need to know your address, but where are you
```

Kiser — Direct

1   from?

2   A      Kettering, Ohio.

3   Q      Do you live in this area now?

4   A      No.

5   Q      How long have you lived in Kettering?

6   A      I've lived there for the last 18 years.

7   Q      Do you have connections to Southwest Virginia?

8   A      Yeah, my family is here.

9   Q      Ms. Kiser, you're from Kettering, Ohio.  Do you know

10  Kenneth Newton?

11  A      Yes.

12  Q      How do you know him?

13  A      I met him whenever I was like 13 years old.

14  Q      Were you living here, or were you just visiting

15  family?

16  A      No, I had an aunt and uncle that used to live in St.

17  Charles.

18  Q      And since that time when you were 13 years old have

19  you kept in contact with him?

20  A      Yes.

21  Q      Are you all friends?

22  A      Pretty much, yeah.

23  Q      Do you know his family?

24  A      Yes.

25  Q      You also know someone named James Crabtree?

Kiser – Direct

1   A    Yes.

2   Q    How do you know him?

3   A    I met him through, well, through Kenny and Joe,

4   actually Joe Newton.

5   Q    Joe is Kenneth Newton's brother?

6   A    Yes.

7   Q    Do you remember when you first met James Crabtree?

8   A    Yes.

9   Q    When was that?

10  A    Joe and I had went to Joe's old house, and Stephanie

11  was just moving in, and he was there, Stephanie and him

12  was arguing, and she was sitting in the van.  I didn't get

13  to meet her at that time, but I met him because he was

14  standing on the porch.

15  Q    That is her house in Pennington, or her house outside

16  of Pennington?

17  A    It's Poor Valley.  I don't know if it's Pennington or

18  not Pennington.  I don't know.

19  Q    Do you remember when that was, as far as the date?

20  A    No.  It was some time, probably two years ago, almost

21  two years ago, the summer, or maybe, maybe three years ago

22  the summer now.  I'm not real sure.  I know it was warm,

23  the weather was nice, maybe about, I'd say about two or

24  three years ago.  I'm not really sure which year.

25  Q    Okay.  Let me ask you this.  Do you remember when Ken

Kiser – Direct

1   and James Crabtree were arrested in Lee County together?

2   A     Yes.

3   Q     And in relation to that date when was the first time

4   you met James Crabtree?

5   A     Probably about a year before, so almost three years,

6   I guess.

7   Q     After that point in time when you first met James did

8   you continue to have contact with him?

9   A     I talked to him, yeah.

10  Q     Was there an occasion that he and Ken came to visit

11  you in Ohio?

12  A     Yes.

13  Q     Do you remember when that was?

14  A     Yes.  But I, I had seen him here, and I also used to

15  call down here and check and see where Joe was at, so

16  that's why I talked to him at the time.

17  Q     I don't think I understand.

18  A     We didn't keep in contact, keep in contact, like if I

19  came down I really didn't see him much.

20  Q     Are you talking about James?

21  A     Yeah.  But I'd usually call Stephanie and Thelma all

22  the time to see, find out where Joe was at, what he was

23  doing, what he was up to, stuff like that.

24  Q     So, going back to James and Ken, they come visit you

25  in Ohio?

Kiser – Direct

```
 1   A     Yes.
 2   Q     In relation -- how many times did they come visit you
 3   in Ohio?
 4   A     Just once.
 5   Q     Do you remember when that was?
 6   A     Yeah.  A year ago this past September, a year and a
 7   half ago.
 8   Q     In relation to when Ken and James were arrested, what
 9   was it?  Was it a couple weeks before, a week before, do
10   you remember?
11   A     No, it was right before.
12   Q     Couple days before?
13   A     Couple days before, yeah.
14   Q     A couple of days before Ken and James were arrested?
15   A     Yes, sir.
16   Q     If you would, tell the members of the jury who came
17   to visit you on that occasion.
18   A     Kenny and, Ken Newton, James, Joe Bud or Joe Bob, and
19   Katina.
20   Q     Did you know Joe Bud before then?
21   A     No.
22   Q     Did you know Katina before then?
23   A     I had seen her, but I don't know her.
24   Q     Do you, do you remember approximately what time they
25   arrived in Ohio?
```

```
1    A     It was fairly early.  I'm not exactly real sure what
2    time.  But it was earlier in the day.
3    Q     How far is Kettering from here?
4    A     Over there, about 350 miles.
5    Q     What is Kettering near?
6    A     Oh, yeah, it's next to Dayton, Ohio.  It's just right
7    on the outskirts of Dayton, Ohio.
8    Q     Did you know they were coming before they showed up?
9    A     Yes.
10   Q     How did you know they were coming?
11   A     Because Kenny called.  At first I didn't believe him.
12   Q     What did he tell -- did he call and tell you why they
13   were coming, or what did he tell you?
14   A     Not initially, no.  Then he said something, asked if
15   I could get him, and I said no, not really, but my friend
16   was there, and she said she could.  But I didn't believe
17   he was really coming, because he had said he was coming
18   quite a bit before.
19   Q     Just so the jury is clear, just tell us how you found
20   out Kenny was coming?
21   A     He called me when he was on 75 about to get on 657,
22   so I knew he was really up there.
23   Q     Is that close to where you live?
24   A     Yeah.
25   Q     Had he told you why he was coming?
```

Kiser – Direct

1   A    He had said something previously, but like I said, I
2   didn't believe that he was coming.
3   Q    What happened when he and James and Katina drove to
4   your house?
5   A    We sat around for a little while, and there was
6   another friend there, we sat around for a while, Kenny
7   made a phone call, and Connie and James left for a while.
8   Q    Who is Connie?
9   A    She is, was, she was, her daughter was dating my son,
10  my youngest son at the time.
11  Q    Was she living with you at the time?
12  A    She was staying there, not living there but staying
13  there.  She had got kicked out and she was on the streets,
14  so I let her stay there until she found someplace else to
15  move on to.
16  Q    When Ken and James and Joe Bud and Katina got there,
17  did they tell you what they were there, what they needed
18  to do?
19  A    Yes, sir.
20  Q    Who did you talk to about that?  Who told you what
21  they were there for?  Was it Kenny, James, Joe Bud,
22  Katina?
23  A    Kenny and James.
24  Q    What did they tell you?
25  A    They were looking for some OxyContin.

Kiser – Direct

1   Q    Did they tell you how they were going to pay for it?

2   A    They didn't tell me how they were going to pay for

3   it, but James said he had money.

4   Q    How much money?

5   A    He said he had $25,000.

6   Q    Did you believe him?

7   A    No, not at first.

8   Q    Did you believe him later?

9   A    Well, I don't know how much he had.  I do know that

10  he had, you know, I seen him with a couple hundred dollars

11  bills.  We went to the liquor store later, got some

12  liquor, and he paid for that, and they went to a motel.

13  Q    I don't want to get ahead of where we were before.  I

14  think we were talking -- but they showed up, they told you

15  that they wanted OxyContin, and that they had money for

16  it, right?

17  A    Right.

18  Q    What did you do, or what did they do after they got

19  there and told them that?

20  A    I didn't do anything, actually.  We didn't do

21  anything for a little while.  We just kind of sat around

22  for a little while talking, Kenny and I was talking for a

23  while, introduced me to everybody.  That was for a little

24  while.  Kenny made a phone call, called somebody, and then

25  there was nothing, he couldn't do whatever he wanted, and

Kiser – Direct

1   then Connie called somebody.

2   Q    What did she call someone for?

3   A    OxyContin.

4   Q    After she called that person what happened?

5   A    James and Connie left.

6   Q    How long were they gone?

7   A    Quite a few hours.

8   Q    Were you still at your house when they came back?

9   A    Yes.

10  Q    What happened when they came back?  What did they do?

11  A    I seen them, for one thing.

12  Q    Saw what?

13  A    The OxyContin, seen the bag full.  They were in a

14  bag, clear zip-lock type plastic bag.  I had seen, I don't

15  know --

16  Q    Do you remember what color they were?

17  A    Green.

18  Q    Were they just in a plastic bag, or anything else, do

19  you remember?

20  A    Just like a zip-lock plastic bag, I guess, something

21  liking that.

22  Q    Do you know how many were in the bag?

23  A    No.

24  Q    Two or three, or was it a lot more?

25  A    No, it was a lot.  I don't know how many.

Kiser – Direct

```
1   Q     Who had the OxyContins?

2   A     Jack.

3   Q     Did he just throw it on the table?

4   A     No, he walked in, like my kitchen table is here, and

5   then in the middle of my house is stairways that goes up,

6   and then there's a sliding glass door here, so they walked

7   in the sliding glass doors, under the steps, and Kenny and

8   I were still sitting at the table, Kenny and I were still

9   talking, and then they just walked in and James showed

10  what he had, or showed the bag.

11  Q     Did he show you anything else other than the

12  OxyContin?

13  A     I seen cocaine.

14  Q     When did you see the cocaine?

15  A     A little bit later on.

16  Q     Still at your house?

17  A     I believe so.

18  Q     Who had it?

19  A     James.

20  Q     If you would, describe for the jury what it looked

21  like, what kind of packaging it was.

22  A     In it was white, big, I don't know if it was, it was

23  just like, looked like confectionary sugar in a sugar bag,

24  is what it looked like, but not a full, not a full

25  confectionary sugar bag, but it was white and in a plastic
```

Kiser – Direct

 1   bag.  I don't know how much, exactly what was in it.

 2   Q     How did you know it was cocaine?

 3   A     Because he said so.

 4   Q     Who said so?

 5   A     They were talking about it, Connie and James talking

 6   about it.  Everybody was talking.  They just said they got

 7   some dope.  That's how it came out.

 8          THE COURT:  Tell me again who Connie is?  I'm

 9   sorry.  Or was?

10          THE WITNESS:  Nobody, actually.  She was going

11   with my son at the time, her daughter was going with my

12   son.

13          THE COURT:  Connie's daughter?

14          THE WITNESS:  Yeah.  Actually, her daughter ended

15   up pregnant --

16          THE COURT:  Was Connie living with you?

17          THE WITNESS:  She stayed with me for a little

18   while.  Long enough, like I said.  She got kicked out, and

19   my son was dating her daughter, so I'm not going to leave

20   her on the streets, and I told her she could stay there for

21   a little while until she gets herself together and gets

22   out.

23          THE COURT:  Okay.  Thank you.

24   BY MR. LEE:

25   Q     After James showed you the cocaine and everybody was

Kiser - Direct

1   talking about it, and the OxyContin, what did you all do

2   then?

3   A    We were sitting at the table, and they used, Kenny

4   snorted OxyContin, and I thought it was the cocaine

5   because James shot up, but I thought it was the cocaine,

6   because I didn't think, like I talked to you before, then

7   I found out you could do it that way, because I told you

8   he lit it with the lighter, that did melt it, but I didn't

9   know it was a pill, because I thought it was the coke in

10  the spoon.

11  Q    You're taking about --

12  A    No, that was James.

13  Q    James was snorting?

14  A    No, Kenny snorted it; James shot it up.

15  Q    Pills or cocaine?

16  A    I thought it was the cocaine, but when I talked to

17  you all before, because I didn't know that you could do

18  the pills like that.

19  Q    Well, I just want you to testify about what you knew

20  at the time.

21  A    I don't know exactly which one it was for sure.

22  Q    That's all right.

23  A    Okay.  I don't know exactly which one it was for

24  sure.

25  Q    After you all sat around for a while, and they used

```
 1   some of the drugs --
 2   A    We didn't sit around much longer.
 3   Q    -- what did you do then?
 4   A    Told them we had to go, we had to get out of my house
 5   because I had two kids that were going to come home, they
 6   were old, but they were going to come home.  We left
 7   there, went to the liquor store, and then went to, they
 8   asked where is a motel at around here.  Well, there's only
 9   one that I know, and went there and got a room.
10   Q    What happened?
11   A    We were drinking, just laughing having a good time,
12   everything.  Somebody came and knocked on the door, and
13   then James and Connie left again.  And then, I don't know,
14   about an hour later, hour and a half later, I mean Kenny
15   went to go find out where they went.  Well, they had got
16   another room.
17   Q    Did they buy any more drugs while they were there at
18   the hotel?
19   A    I don't know.  That I don't know.
20   Q    Did you talk about that?
21   A    They wanted, they wanted, he wanted to get more.
22   Q    Who did?
23   A    James wanted to get more.
24   Q    More what?
25   A    OxyContin.
```

Kiser – Direct

1   Q     Did he tell you why he wanted to get more?

2   A     He didn't get enough, and I don't know why, but he

3   didn't get enough.

4   Q     Do you know if he did anything there while at the

5   hotel to get more drugs?

6   A     I don't know, but I assume that's why that gentleman

7   showed up.

8   Q     But you don't know that for a fact?

9   A     No, I don't know that for a fact, and I don't know

10  who he was.  I can tell you what he looks like kind of,

11  but that's about it.

12  Q     Did you all stay at the hotel all night?

13  A     Uh-huh, because we fell asleep, me and Kenny and Joe

14  Bud and Katina stayed in the one room.

15  Q     What happened the next day?

16  A     We got up, took me home, I went home, or actually I

17  had my car, I went home, they followed me home, just got

18  ready, and Connie said she would meet James.  James was

19  waiting on Connie, and she said she would meet him, and

20  she never showed up.  But he was making them wait around

21  waiting on her.

22  Q     Do you know why he was waiting on her?

23  A     Yes, because she was very smitten with her.

24  Q     Didn't have anything to do with drugs?

25  A     No, no.  Not at that point, nothing.

1   Q    And after they waited around for a while, she never

2   showed, what happened?

3   A    I called her repeatedly over and over, and she

4   wouldn't answer her phone, and Kenny kept saying, "We've

5   got to go, we've got to go."  And Joe Bud and Katina both

6   said, "We need to go."

7   Q    Did they leave then?

8   A    Uh-huh.

9   Q    How long after that was it that you found out that

10  Ken --

11  A    The next day.

12  Q    Thank you, ma'am.  Please answer any questions that

13  defense counsel has.

14          MR. LEE:  I don't have any further questions.

15          THE COURT:  Thank you.

16              CROSS EXAMINATION

17  BY MR. CHAFIN:

18  Q    Good afternoon, Ms. Kiser.  I represent Stephanie

19  Newton.  My name is Ben Chafin.  And I want to ask you,

20  you indicated that you knew my client?

21  A    Stephanie?

22  Q    Yes.

23  A    Yes.  Now, after the initial, the first time when I

24  met Stephanie she wouldn't get out of the car, or when I

25  met her husband, you know, because I've since come back

```
 1    quite a bit of times and stayed with Thelma a lot, and
 2    then over time I've got to know Stephanie.
 3    Q    Nothing you've gotten to know about Stephanie has
 4    anything to do with drugs, has it?
 5    A    No, sir.
 6    Q    Do you know what her attitude is about drugs?
 7    A    She has, she has nothing to do with them, I know
 8    that.  She has got her kids, and between her and Thelma,
 9    that's all they care about.
10    Q    In fact, you know that she didn't know --
11    A    No, she was not.
12    Q    -- that James was even there?
13           MR. LEE:  Objection, Your Honor.  Lack of
14    foundation.
15           THE COURT:  Wait, wait, Mr. Chafin.  Let me rule
16    on the objection.  I overrule the objection.
17    BY MR. CHAFIN:
18    Q    Did James tell you --
19           MR. LEE:  Objection, Your Honor.  Hearsay.
20           THE COURT:  Well, there's been previous
21    introduction of statements by the, by the declarant under
22    these circumstances, and I'll allow it.  Overrule the
23    objection.  Go ahead.
24    BY MR. CHAFIN:
25    Q    Didn't James tell you that he had secretly gone
```

1   there?

2   A    He didn't say that, but whenever he, they didn't

3   know --

4          THE COURT:  Wait a minute, ma'am.  If he didn't

5   say it, you can -- wait, wait.  You can only testify as to

6   what you know of your own knowledge of what Mr. Crabtree

7   told you.  So, he didn't tell you that?

8          THE WITNESS:  He did say that nobody knew where

9   they were.  That's what he said.  And I would assume her,

10  and I also --

11         THE COURT:  I'm not asking you to assume, ma'am.

12  Thank you.  You may answer the question.

13  BY MR. CHAFIN:

14  Q    Do you know whether or not -- did James talk with you

15  about whether or not he would talk to Stephanie while he

16  was there?

17  A    No, he would not answer the phone when she called.

18  Q    Was the phone ringing?

19  A    Yes.

20  Q    Have you made the statement that Stephanie blew his

21  phone up?

22  A    Yes.

23  Q    What did you mean by that?

24  A    She called repeatedly over and over, and nobody,

25  whoever you're calling doesn't answer.

Kiser - Cross

1   Q    Did James say why he wouldn't take the call?

2   A    No, sir.

3   Q    And you, you felt bad about this, what happened

4   there?

5   A    Yes, sir.

6   Q    And you ended up calling up Stephanie to apologize to

7   her?

8   A    No, sir, Ii did not call her.  I apologized to her

9   face.

10  Q    Why did you think it was necessary to apologize to

11  Stephanie?

12  A    I thought that Stephanie should know everything that

13  happened.  You mean with Connie?

14  Q    Yes.

15  A    I thought Stephanie should know that everything

16  happened between, that he was cheating on her.  I thought

17  she should, that she had the right to know that.

18  Q    And you mentioned Stephanie's, that she had those

19  kids?

20  A    Uh-huh.

21  Q    Are they James' kids?

22  A    Two of them are.  The other two are adopted.  Kelsey

23  and Henry is his.

24  Q    You've known -- strike that.  You've known Kenny

25  Newton for a long time, correct?

1    A    Since I was 13.  I've known all the Newtons since I

2    was 13.

3    Q    Has he always been involved in the drug culture?

4    A    Yes, sir.

5    Q    To your knowledge?

6    A    Yes.

7    Q    And is he quite a bit older than James Crabtree?

8    A    I think so, yes.

9    Q    I believe that's all, Ms. Kiser.  Thank you.

10           MR. DENE:  I have just a couple, Your Honor.

11                    CROSS EXAMINATION

12   BY MR. DENE:

13   Q    You've been in and around this area quite a few

14   times?

15   A    Yes, sir.

16   Q    Do you know Thelma Newton?

17   A    Yes, sir.

18   Q    Have you been around Thelma Newton quite frequently?

19   A    Yes, sir.

20   Q    Did you know what her attitude was concerning drugs?

21   A    Yes, sir.

22   Q    Tell the jury, please.

23   A    Thelma, Thelma never used or had anything to do with

24   drugs.  Thelma wouldn't even take her own medication

25   right.

Kiser - Cross/Redirect

```
 1    Q    Did you say at one time that Thelma had a difficult

 2    time taking her medication?

 3    A    Yes, sir.  I was down here last, I believe it was

 4    last year.  She had pneumonia.  She wouldn't even stay in

 5    the hospital because she got out so she could watch the

 6    kids.

 7              THE COURT:  The question to you, ma'am -- you

 8    need to listen to the question -- the question to you was

 9    whether she did not like to take medicine.

10              THE WITNESS:  That's what I'm saying.  She

11    wouldn't stay in the hospital, she won't take the drugs,

12    and when she got home she wouldn't take her medication

13    right because she watched the kids.

14              THE COURT:  All right.  Go ahead, Mr. Dene.

15              MR. DENE:  Nothing further.

16              THE COURT:  Mr. Lee?

17                     REDIRECT EXAMINATION

18    BY MR. LEE

19    Q    Ma'am, you like Stephanie Newton, don't you?

20    A    Stephanie?

21    Q    Yeah.

22    A    Not really.

23    Q    You don't like her?

24    A    Not really.  I mean, she's -- I'm sorry, Stephanie,

25    but you don't have a good personality.
```

Kiser – Redirect

```
 1   Q    Isn't the real reason James was hiding from her was

 2   he was sleeping with your best friend?

 3   A    He didn't sleep with her until after that day.

 4   Q    Connie, he slept with her that night, didn't he?

 5   A    Yes.

 6   Q    You all were out drinking and partying?

 7   A    Yes, sir.

 8   Q    Stephanie was calling to find out where James was?

 9   A    Yes, sir.

10   Q    He probably wouldn't answer if he was sleeping in a

11   hotel room having sex with your friend, would he?

12   A    No.

13   Q    And that's why she was upset, and that's why you were

14   upset, wasn't it?

15   A    I didn't like what he done, no.

16   Q    So, it didn't have anything to do with drugs?

17   A    No.

18   Q    It had to do with him sleeping around on Stephanie?

19   A    Yeah.

20   Q    That's why you didn't want to tell Stephanie he was

21   in a hotel room, right?

22   A    He didn't answer the phone earlier at the house,

23   either, when she called.

24   Q    James Crabtree and Stephanie have a lot of money?

25   A    No.
```

1  Q    Are they rich?

2  A    No, sir.

3  Q    Were they even married at the time?

4  A    I don't, don't think so.

5  Q    $25,000 in cash is a lot of money?

6  A    Yes, sir.  Now, I have things that I've heard, but I

7  don't think I can tell you that.

8  Q    I'm not asking for you to talk about what you've

9  heard; I'm just saying $25,000 is a lot of money, right?

10  A    Yes.

11  Q    A lot of money to give a boyfriend, right?

12  A    Yeah.

13  Q    Who doesn't have a job, correct?

14  A    Yes.

15  Q    Who deals drugs, correct?

16  A    I didn't know --

17        MR. CHAFIN:  He's leading this witness.

18        THE COURT:  I'll overrule the objection.  Go

19  ahead.

20        THE WITNESS:  At first I didn't know he dealt

21  drugs.  I didn't know what was going on with that until he

22  said he had the money.

23  BY MR. LEE:

24  Q    So, that's a lot of money to give someone who deals

25  drugs?

Kiser – Redirect

```
 1   A    Yes, sir.
 2   Q    It would be unusual for someone to just give $25,000
 3   in cash to their boyfriend who doesn't have a job?
 4              MR. CHAFIN:  I'll object to that.  He's asking
 5   the witness to speculate on what is usual or unusual.
 6              THE COURT:  Well, I'll overrule the objection.
 7   The witness has testified as to the relationship of the
 8   parties, and I'll allow the question.
 9              THE WITNESS:  Ask me again.
10   BY MR. LEE:
11   Q    It's unusual just to give somebody that much cash,
12   right?
13   A    Yes, sir.
14   Q    Unless they have a purpose for it, right?
15   A    Yes.
16              MR. LEE:  No further questions.
17              THE COURT:  Go ahead, ma'am.
18              THE WITNESS:  That's just something I heard.
19              THE COURT:  Okay.  Anything further from this
20   witness?  All right.  Thank you, ma'am.  You may step down.
21   May this witness be excused?
22              MR. LEE:  I have no objection, Your Honor.
23              THE COURT:  All right.  Ma'am, you may be
24   excused.  Thank you, very much.
25              MR. LEE:  Government calls Katina Walker.
```

```
 1              THE COURT:  Tell you what, Mr. Lee.  Before we do

 2    that, let's take a short break.  Ladies and gentlemen,

 3    we're going to take a break and you can leave your

 4    notebooks in your seat.

 5         (The jury retired to the jury room, after which the

 6    following occurred:)

 7              THE COURT:  We'll be in recess.

 8         (Recess from 3:47 p.m. to 4:06 p.m.)

 9              THE COURT:  All right.  We're ready for the jury.

10         (The jury entered the courtroom and was seated in the

11    jury box.)

12              THE COURT:  All right.  We're ready to go again.

13    Mr. Lee, call your next witness.

14              MR. LEE:  Government calls Katina Walker.

15         KATINA WALKER, GOVERNMENT'S WITNESS, SWORN

16                   DIRECT EXAMINATION

17    BY MR. LEE:

18    Q    Ma'am, would you please introduce yourself?

19    A    My name is Katina Marie Walker.

20    Q    Ms. Walker, I'm going to ask you to speak up a little

21    bit.  It's a little hard to hear in here.

22    A    My name is Katina Marie Walker.

23    Q    Where are you from?

24    A    Lee County, Virginia.

25    Q    Where in Lee County are you from?
```

1    A      Pennington Gap.

2    Q      Do you know Stephanie Newton?

3    A      Very, not really all that much.  I just met her once.

4           THE COURT:  Ms. Walker, if you'll look toward me

5    if you speak, that way everybody can hear you.

6           THE WITNESS:  Yes, sir.

7    BY MR. LEE:

8    Q      Do you know James Crabtree?

9    A      Yes.

10   Q      How do you know him?

11   A      Through Ken Newton.

12   Q      How do you know Ken Newton?

13   A      Through Lisa Combs.

14   Q      How do you know Lisa Combs?

15   A      Through Barbara Ann Thomas.

16   Q      Are these all people --

17   A      Friends of mine.

18   Q      Friends of yours, you socialize with?

19   A      Yeah.

20   Q      Fair to say you've had a drug problem in the past?

21   A      Yes.

22   Q      Still using drugs?

23   A      No, sir.

24   Q      When did you quit?

25   A      February, '09.

Walker – Direct

```
 1   Q    Ken Newton, Lisa Combs, James Crabtree, did you meet
 2   all them through the use of drugs?
 3   A    Yes.
 4   Q    When did you start using?
 5   A    First time I used drugs I was 21.
 6   Q    How old are you now?
 7   A    Thirty.
 8   Q    What types of drugs did you use in the last nine
 9   years?
10   A    Marijuana mainly.  OxyContin.  I tried cocaine.
11   That's about it.
12   Q    Why did you quit?
13   A    Because I have a nine year old son I need to take
14   care of.
15   Q    Now, have you been to St. Charles?
16   A    I used to live in St. Charles.
17   Q    When did you live in St. Charles?
18   A    I moved into St. Charles in November of '08.
19   Q    How long did you live there?
20   A    Until, I want to say August, September of '09.
21   Q    Is that when you spent most of your time with Ken
22   Newton, Lisa?
23   A    Yeah, after I moved out of St. Charles.
24   Q    After you moved out of St. Charles?
25   A    Yeah.
```

Walker - Direct

```
 1   Q     At some point in time did you take a trip to Ohio
 2   with Ken Newton and James Crabtree?
 3   A     Yes, I did.
 4   Q     When did that trip take place?
 5   A     I'm not exactly for sure because it was right before
 6   Kenny was raided and arrested, a few days before then.
 7   Q     If I told you that occurred in October of 2009?
 8   A     Yes.
 9   Q     October 15th that he was raided, does that sound --
10   A     That sounds about right, yeah.
11   Q     How many days beforehand did you make that trip?
12   A     Two, maybe three days.  I can't exactly remember.
13   Q     Why don't you tell the members of the jury how you
14   became involved in that trip?
15   A     Ken had asked me, he said he was going to go see
16   Sheila, and asked me if I would drive.  He said we was
17   going to be partying, and having a good time.  I said
18   sure, I'd go.
19   Q     There were some other things involved, though, right,
20   that you knew about?
21   A     Well, yeah.  I knew there was going to be drugs up
22   there, and I knew we were going to be partying, and stuff.
23   But I didn't, you know, know that he was going to be
24   bringing a large quantity of drugs back.
25   Q     Didn't you sit down with Ken and Lisa and James
```

Walker – Direct

```
 1   before you left to talk about it?
 2   A    We may have.  I don't quite remember.
 3   Q    Do you remember testifying in front of the grand jury
 4   in November of 2010?
 5   A    Yes.
 6   Q    I'll show you a portion of your testimony, and have
 7   you review that.  Read it to yourself.  Does that refresh
 8   your recollection of conversations you had before you went
 9   to Ohio with Ken and James?
10   A    Yes.
11   Q    Why don't you tell the members of the jury what you
12   talked about.
13   A    They were talking about -- well, like I said, they
14   were going to buy drugs, but I didn't know it was going to
15   be such a large quantity.  I thought it was just going to
16   be personal use.  I did not know that Ken had planned on
17   buying drugs to sell.
18   Q    They wanted you to drive, didn't they?
19   A    Yes.
20   Q    They wanted you to carry the drugs for them?
21   A    That part of the conversation did not happen until
22   after we were up there.
23   Q    Okay.  I'm going to show you your grand jury
24   testimony.
25             MR. LEE:  I'd ask this be marked as an exhibit.
```

1    I'll mark this as Government's Exhibit 21.

2    BY MR. LEE:

3    Q    Do you agree this is your grand jury testimony?  It's

4    on the screen in front of you.

5    A    Yes, I do.

6    Q    And you were truthful at the time you gave this

7    statement?

8    A    Yes.

9    Q    You say, "There was one day I was at Ken's house, and

10   Lisa and Ken was talking about him going to purchase some

11   drugs from some people that another friend knew, and it

12   was in Ohio, and they needed an extra driver and possibly

13   someone to carry the drugs back for them."  Correct?

14   A    Well, not exactly.  He said they were going to go

15   partying; there were going to be drugs there.

16   Q    That's not what you testified to.  You testified

17   before you even left you knew you were bringing drugs

18   back, right?

19   A    No.

20   Q    And you, you went on to say, after I asked you, "When

21   you say 'they,' who are you talking about?"  And your

22   answer was, "Ken and James," correct?

23   A    Yes.

24   Q    And the question, "Were they both there when this

25   conversation was going on?"  And your response was, "Yes."

Walker – Direct

```
1    A    Yes.

2    Q    "What type of drugs were you supposed to get with

3    them?"  And the answer was, "OxyContin," correct?

4    A    Yes.

5             MR. LEE:  Your Honor, I'd move to admit

6    Government's Exhibit 21.

7             THE COURT:  It will be admitted.

8        (Government's Exhibit No. 21 was received in

9    evidence.)

10   BY MR. LEE

11   Q    The next page is your grand jury testimony, and I'd

12   ask that this be marked as Government's Exhibit 22.  I'll

13   ask you to read through that yourself.  That's your grand

14   jury testimony?

15   A    Yes, it is.

16   Q    Again, you were under oath when you made these

17   statements?

18   A    Yes, sir.

19   Q    I'll show you Government's Exhibit 22 on the screen.

20   Starting out at line one, the question is, "Did you know

21   how they were going to pay for the drugs or anything like

22   that?"  Do you remember that question?

23   A    Yes.

24   Q    Your response was, "From what I understood, and

25   everything, James had got some money somehow."
```

Walker – Direct

1   A     Yes, sir.

2   Q     And then you went on to say, "I don't know where he

3   got the money from, but apparently it was a joint deal

4   that they were going in to purchase the drugs."

5   A     Yes.

6   Q     The question, "Do you know how much money they had?"

7   And your response was, "No."  And then the question at

8   line 13 is, "Before you left did you know what type of

9   quantities you all were looking to buy there?"  And what

10  was your response?

11  A     "I knew it was over a hundred, but I didn't know that

12  it was going to be like 280."

13  Q     Over 100 OxyContin, that's a lot, isn't it?

14  A     Yes, it is.

15  Q     You knew they were bringing back a good amount of

16  OxyContin even before they left, didn't you?

17  A     No, I did not.

18  Q     You testified under oath that you did?

19  A     Apparently I didn't understand the question at the

20  time.

21         MR. LEE:  Move for admission of Government's

22  Exhibit 22, Your Honor.

23         THE COURT:  It will be admitted.

24     (Government's Exhibit No. 22 was received in

25  evidence.)

Walker – Direct

```
 1   BY MR. LEE:
 2   Q    What happened when you got up to Ohio?
 3   A    We went to Sheila's house.
 4   Q    Did you know Sheila?
 5   A    I met her once before.
 6   Q    Where did you meet her?
 7   A    At Ken's house.
 8   Q    Drugs going on when you met her there?
 9   A    Yeah.
10   Q    Was she using?
11   A    Not that I know of.
12   Q    When you got to Sheila's house what did you do?
13   A    Sat around, smoked a little marijuana.
14   Q    What else did you do?
15   A    Talked and crap.
16   Q    I'm sorry?
17   A    We just talked, just shoot the crap a little bit,
18   not really talking about much of anything.
19   Q    Then what happened?
20   A    And then Ken and Sheila and Connie left.  I believe
21   James may have left, too.  I can't quite remember.  I was
22   pretty messed up at that point.
23   Q    Do you remember what they had when they came back?
24   A    They had OxyContin, cocaine and alcohol.
25   Q    What did you do when they got back?
```

Walker – Direct

1   A     We went to a motel room.

2   Q     Then what did you do?

3   A     Me and Joe stayed in the room and, in our room, and

4   Ken and James and Sheila and Connie had left and was gone

5   for several hours.

6   Q     Do you know what they were doing?

7   A     No, I don't.

8   Q     Do you know where they went?

9   A     No, I don't.

10  Q     What happened the next morning?

11  A     When we got up, packed up and came back to Virginia.

12  Q     What were you getting out of it?

13  A     Just a trip.

14  Q     They were going to pay you with drugs, weren't they?

15  A     Mainly, yeah.

16  Q     They were going to give you an ounce of marijuana?

17  A     Yeah.

18  Q     What else were, were they going to give you?

19  A     That's it.

20  Q     How much cocaine did they have with them when they

21  got back?

22  A     I'm not exactly for sure.

23  Q     What did it look like?

24  A     Like a sandwich bag, about an inch and a half in

25  diameter.

Walker – Direct

```
 1   Q    How many pills did they have?

 2   A    Quite a few.  I don't know exactly.

 3   Q    More than 100?

 4   A    Yeah.

 5   Q    More than 200?

 6   A    Possibly.

 7   Q    Did you ever see any money that day?

 8   A    No.

 9        MR. LEE:  If I could just have a moment, Your

10   Honor.

11   BY MR. LEE:

12   Q    When you all got back to Virginia, the next day did

13   you go to Ken's house?

14   A    Yes, I did.

15   Q    Why did you go there?

16   A    Hang out.

17   Q    Did you get drugs that day?

18   A    Yeah.

19   Q    What did you get?

20   A    I got, I got five marijuana joints, cigarettes.

21   Q    Did you get any OxyContin?

22   A    No, I did not.

23   Q    Are you sure about that?

24   A    Not exactly.

25   Q    Is it possible you might have gotten OxyContin?
```

Walker – Direct

```
1    A     No.

2    Q     I'll show you your grand jury testimony again.  Does

3    that refresh your recollection of what was going on that

4    day?

5    A     Yes.

6    Q     Okay.  Did you get Oxy?

7    A     Yes, sir.

8    Q     Who was at the house that day?

9    A     It was me, and Lisa and Ken, I believe Barbara Ann

10   and maybe Sabrina was there.  I can't remember who all was

11   there.

12   Q     What about James?

13   A     I can't remember.

14   Q     Are you sure you can't remember?

15   A     Well, like I said, I had a drug problem.  I smoked a

16   lot of marijuana at that time.  I don't remember.

17              MR. LEE:  I'll mark Government's Exhibit 23.

18   BY MR. LEE:

19   Q     This, again, is the grand jury testimony, line 11,

20   says, "After you dropped Ken and Joe off what did you do?"

21   A     That's when you was talking about dropping James off

22   after we got back from Ohio?

23   Q     Yeah.  The next question was, "When was the last time

24   you saw Ken and James," correct.  Your answer was, "I seen

25   Ken and James the very next day when me and Lisa had went
```

Walker - Direct

```
 1   to the house and talked to them, and sat and smoked pot,

 2   done an 80." Right?

 3   A    Yes.

 4         MR. LEE:  Move for admission of Government's

 5   Exhibit 23, Your Honor.

 6         THE COURT:  It will be admitted.

 7     (Government's Exhibit No. 23 was received in

 8   evidence.)

 9   BY MR. LEE:

10   Q    Aside from you guys using drugs at Ken's house, Ken,

11   James and Lisa, what else is going on?

12   A    Could you be a little more specific than that?

13   Q    Were people selling drugs that day?

14   A    I didn't see anybody sell drugs.

15   Q    Were people coming by to get drugs?

16   A    There was people coming in and out of the house, but

17   I don't know what they were doing.  I never seen anything.

18         MR. LEE:  Mark this as Government's Exhibit 24.

19   BY MR. LEE:

20   Q    Please read that to yourself.

21   A    Yeah.

22   Q    And this is just a continuation of your previous

23   testimony where you stated, you were asked were they

24   selling Oxys to anybody else when you were there, and you

25   said Ken was, correct?
```

Walker  -  Direct/Cross

1    A     Yes.

2    Q     So, Ken was selling Oxys?

3    A     Apparently.  You all busted them with all the dope,

4    and everything.  I didn't actually see him sell drugs to

5    anyone.  I never seen money change hands.

6    Q     You further went on to say more than ten people came

7    by?

8    A     There was more than ten people there that day, yeah,

9    but I didn't actually see him sell drugs to anyone.

10   Q     Ma'am, it's fair to say you don't want to be here, do

11   you?

12   A     No, I do not.

13   Q     You don't want to be testifying?

14   A     No, sir, I do not.

15   Q     In fact, you called yesterday and said you didn't

16   have a ride?

17   A     Yeah, and I called my mom and said I would be

18   arrested if I wasn't here, so I am here.

19              MR. LEE:  No further questions.

20              THE COURT:  Cross examination?

21                    CROSS EXAMINATION

22   BY MR. CHAFIN

23   Q   Good afternoon, Ms. Walker.  My name is Ben Chafin,

24   and I represent Stephanie Newton.  Do you know Stephanie

25   Newton?

Walker - Cross

```
 1   A     I've met her one time.

 2   Q     Did you know her in school, or did she train you --

 3   A     As a personal care agent, when I worked for

 4   Innovative Health Care.  They sent me into a home where

 5   she was working for orientation, and that's how I met

 6   Stephanie.

 7   Q     Was she working as a nurse at that time?

 8   A     Yes.

 9   Q     How long ago was this?

10   A     Five or six years ago.  It's been a while back.

11   Q     Now, do you remember being asked in your grand jury

12   testimony whether or not Stephanie ever messed with drugs,

13   or took pills, or smoked weed, or anything like that?

14   A     As far as I know, yes, I do remember; and as far as I

15   know, no, she does not.

16   Q     Did you ever see her around her Uncle Ken's, Ken

17   Newton's?

18   A     I've seen her pull in the driveway and pull out.  You

19   know, I never seen her in the home, I never talked to her

20   there.  The only time I ever seen her was James was there.

21   Q     Now, ma'am, you previously reviewed your testimony,

22   and looking at this at line seven, would you tell us who

23   you were talking about when you were talking about that

24   they were both going in to purchase the drugs?

25   A     James and Ken.
```

Walker - Cross

1   Q      Thank you, ma'am.  That's all.

2            MR. DENE:  I have a couple, Your Honor.

3            THE COURT:  I'm sorry.  Mr. Dene?

4                    CROSS EXAMINATION

5   BY MR. DENE:

6   Q      How long did you hang around with Ken Newton?

7   A      About a month and a half.

8   Q      During that month and a half did you have occasion to

9   meet Thelma Newton?

10  A      Yes, I did.

11  Q      Did you testify at the grand jury as to what her

12  demeanor was, or how she thought about drugs?

13  A      Well, my opinion was, you know, was that she was

14  totally against it.

15  Q      Do you remember your testimony at the grand jury

16  where you said, you were asked, "Do you know Thelma

17  Newton," and your answer was, "Yes."

18  A      Yes, sir.

19  Q      "And who is that?"  "That's Ken Newton's sister."

20  A      Yes.

21  Q      "And have you ever had any relationship with her?"

22  And your answer was, "That's all."  "Drug wise?"  "No, she

23  was against all of it.  She told Ken several times he

24  needed to stop, he needed to straighten back up."  Was

25  that your testimony at the grand jury?

```
 1    A    Yes, sir.
 2              MR. DENE:  That's all I have, Your Honor.
 3              THE COURT:  Mr. Lee, anything further?
 4              MR. LEE:  No, Your Honor.
 5              THE COURT:  All right.  Thank you, ma'am.  If
 6    you'll step down, if you'll wait outside, please.
 7              MR. LEE:  Government calls Ken Newton.
 8        KENNETH NEWTON, GOVERNMENT'S WITNESS, SWORN
 9                    DIRECT EXAMINATION
10    BY MR. LEE:
11    Q    Sir, would you please introduce yourself to the
12    members of the jury?
13    A    Kenneth Newton.
14    Q    Mr. Newton, how old are you?
15    A    Fifty.
16    Q    Where did you grow up?
17    A    St. Charles, Virginia.
18    Q    Pretty much lived there all your life?
19    A    Yes, sir.
20    Q    Mr. Newton, you were a defendant in the case of
21    United States of America v. Kenneth Newton, and others,
22    correct?
23    A    Yes, sir.
24    Q    And pursuant to, to being charged in that case you
25    entered into a plea agreement with the Government, and
```

K. Newton – Direct

1    pleaded guilty to two different offenses, correct?

2    A    Yes, sir.

3    Q    I'm going to hand you what has been marked as

4    Government's Exhibit 11.  If you'd just look through that.

5    Is that your plea agreement?

6    A    Yes, sir.

7              MR. LEE:  I move for the admission of

8    Government's Exhibit 11, Your Honor.

9              THE COURT:  It will be admitted.

10       (Government's Exhibit No. 11 was received in

11   evidence.)

12   BY MR. LEE:

13   Q    Pursuant to your plea agreement you pled guilty to a

14   count of possession of a firearm in furtherance of a drug

15   trafficking offense, correct?

16   A    Yes, sir.

17   Q    And also possession of a firearm after having been

18   convicted of a felony?

19   A    Yes, sir.

20   Q    Have you been sentenced on those charges?

21   A    Yes, sir.

22   Q    What were you sentenced to?

23   A    Twenty-two years.

24   Q    264 months?

25   A    Yes, sir.

K. Newton – Direct

1   Q      How many months have you served so far?

2   A      About 15 or 16.

3              THE COURT:  You need to speak up.

4   BY MR. LEE:

5   Q      I'm going to ask you to speak up a little bit.

6   A      A little over a year.

7   Q      A little over a year?

8   A      Yeah.

9   Q      Mr. Newton, have you been promised anything for your

10  cooperation in this case, or any other case?

11  A      No, sir.

12  Q      Has anything been told about what sort of a benefit

13  you might receive from your cooperation with the

14  Government?

15  A      No, at this time, no.

16  Q      You are hoping that through your cooperation with the

17  Government that the Government will make a motion that

18  your sentence be reduced, though, correct?

19  A      I think it's possible.

20  Q      That's what you want, right?

21  A      Yeah, it would be good.

22  Q      But nothing has been promised to you?

23  A      Right.

24  Q      Now, pursuant to your plea agreement you also were

25  declared an armed career criminal, correct?

K. Newton – Direct

```
1   A     Yes, sir.

2   Q     And you had to forfeit money and a firearm?

3   A     Yes, sir.

4         MR. LEE:  I believe this has been introduced

5   already, Your Honor.

6         THE COURT:  It will be admitted.

7   BY MR. LEE:

8   Q   Mr, Mr. Newton, you said you lived in St. Charles

9   most of your life.  Why don't you tell the jury a little

10  bit about St. Charles.  What kind of town is it?

11  A     It's a mining town.

12  Q     Any good economy there?

13  A     No.

14  Q     What do most people who live, who live in St. Charles

15  do?

16  A     Coal mining, retired.

17  Q     A lot of drugs?

18  A     Buy drugs, sell drugs.

19  Q     Use drugs?

20  A     Get high, yes.

21  Q     Fair to say you and your brothers have been playing a

22  pretty good role in that for the last few years, correct,

23  as far as being involved in drugs, and selling drugs,

24  using drugs?

25  A     Yes, sir.
```

K. Newton – Direct

1   Q    And that pretty much stopped for you when you were

2   arrested in October of 2009?

3   A    Yes, sir.

4   Q    But before that is it fair to say you had a number of

5   run ins with the law?

6   A    Yes, sir.

7   Q    Been convicted of numerous felony offenses?

8   A    Yes.

9   Q    In fact, just to go through them, Mr. Newton, 1987

10  you were convicted of possession of cocaine and LSD with

11  the intent to distribute?

12  A    Yes, sir.

13  Q    1989, you were convicted of distribution of cocaine

14  and distribution of a Schedule IV controlled substance.

15  Ninety-six you were convicted of conspiracy to distribute

16  marijuana, distribution of marijuana, distribution of less

17  than a half ounce of marijuana, two counts of that, and

18  two counts of distribution of cocaine?

19  A    Yes, sir.

20  Q    Did you go to prison for those?

21  A    Yes, sir.

22  Q    In fact, you've been in and out of prison a number of

23  times?

24  A    Yes, sir.

25  Q    And then finally, you've been convicted in this court

K. Newton – Direct

 1   of the charges that I previously stated, right?

 2   A     Yeah.

 3   Q     Now, we mentioned your drug use a little bit.  How

 4   did you start using drugs, or when did you start?

 5   A     I started at a young age.

 6   Q     How old?

 7   A     Fifteen, 16.

 8   Q     Why did you start using drugs?

 9   A     Peer pressure.

10   Q     What did you start using?

11   A     A little bit of marijuana, PCP, just different stuff.

12   Q     That use of drugs continue through most of your life?

13   A     Yes, sir.

14   Q     Pretty much stop once you got arrested this last time

15   and you were incarcerated?

16   A     Yeah.

17   Q     Have you ever worked?

18   A     Yes, sir.

19   Q     What type of work have you done?

20   A     Construction.

21   Q     When was the last time you worked?

22   A     A few months before I got busted.

23   Q     You were busted in October of '09?

24   A     Yeah.

25   Q     Now, Mr. Newton, you're related to Thelma, correct?

K. Newton – Direct

```
 1   A    Yes, sir.

 2   Q    What's your relationship with her?

 3   A    She's my sister.

 4   Q    You're related to Stephanie, also?

 5   A    Yes, sir.

 6   Q    What's your relationship with her?

 7   A    She's my adopted sister.

 8   Q    Now, where does, where did Stephanie work at the time

 9   you were arrested?

10   A    I believe at the jail over in Duffield.

11   Q    What was her position there?

12   A    A nurse, I believe.

13   Q    Did Thelma work?

14   A    Yeah, she was a nurse, too.

15   Q    Your sister, Thelma, was a nurse also?

16   A    Yeah, but not at the jail, I don't believe.

17   Q    Where was she a nurse?

18   A    Home health care, or something like that.

19   Q    Now, have you ever gotten drugs from Stephanie?

20   A    Yes.

21   Q    What kind of drugs have you got from her?

22   A    Xanax.

23   Q    When was that?

24   A    Before I got locked up, before I got busted.

25   Q    For what time period before you got busted?
```

K. Newton - Direct

```
 1    A     Couple of months.

 2    Q     What kind of Xanax?

 3    A     The blue.

 4    Q     If you would tell the members of the jury how that

 5    worked.

 6    A     I took medication all the time, I took a lot of

 7    Xanaxes, and I was prescribed them, and when I didn't have

 8    nothing left I would get them from other people, and she

 9    was getting medication, and I would take it, and then I

10    found out she was getting it out of town, and I got it off

11    her.

12    Q     Would she sell it to you?

13    A     She didn't want to, but I paid for it anyway.

14    Q     How much did you pay?

15    A     Two dollars a pill.

16    Q     Did you buy anything else from her?

17    A     Not from her, no.

18    Q     Do you remember testifying previously about Lortabs?

19    A     I believe that was from my other sister.

20    Q     Which sister was that?

21    A     Thelma.

22    Q     Thelma.  Okay.  Who is seated at the table there,

23    that Thelma?

24    A     Yeah.

25    Q     When did you buy Lortab from her?
```

K. Newton – Direct

```
 1   A    About the same time I was buying Xanaxes from my
 2   other sister.
 3   Q    How much were you paying Thelma for Lortabs?
 4   A    About four dollars a Lortab.
 5   Q    You said this was going on months preceding your
 6   arrest in October of 2009?  How did you learn that you
 7   could buy Lortabs from Thelma?
 8   A    She would see a doctor, she'd get them from the
 9   doctor.  I would get them, she would get them.
10   Q    How did you decide to start buying from her?  How did
11   you know she was willing to sell them?
12   A    Because I was sick, and I was trying to find some,
13   and I'd get her to let me borrow her car until I could
14   find some.  And one thing led to another, and then I found
15   out she had extra, she didn't take them all the time, so I
16   tried to get them from her.
17   Q    Did you use all those pills that you were getting?
18   A    Yes, sir, I did.
19   Q    Did you sell any of them?
20   A    Probably.
21   Q    Why do you say probably?
22   A    Because I was getting quite a few from quite a few
23   people.
24   Q    So, you were both using and selling the Xanaxes and
25   Lortabs you were getting?
```

K. Newton – Direct

1    A    Yes, sir.

2    Q    Where would you do most of your drug selling?

3    A    Around St. Charles.

4    Q    Did you sell from your house?

5    A    Yeah.

6    Q    In fact, that's where you were arrested last time,

7    correct?

8    A    Yeah, I was trying not to sell from my house, but I

9    had to.

10   Q    Okay.  Did you and James Crabtree take a trip to

11   Ohio?

12   A    Yes, sir.

13   Q    What purpose did you have going to Ohio?

14   A    To obtain drugs.

15   Q    What kind of drugs?

16   A    OxyContin.

17   Q    Anything else?

18   A    Cocaine.

19   Q    When did that trip take place?

20   A    October 13th, maybe.  Or the 14th.

21   Q    How did the planning of that trip happen when you

22   decided to make that trip?

23   A    He's got a drug problem, too, and I have a drug

24   problem.  I wasn't as serious as he was.  Anyway, he

25   wanted to get his, it was cheaper that way, to go buy them

1    himself.  He got --

2    Q    We're talking about how you decided to go with James

3    to Ohio, and you said you needed pills, he needed pills?

4    A    Yeah.

5    Q    And then continue on from there about how you knew

6    you could get pills up there.

7    A    Well, I had a couple girlfriends in Ohio.

8    Q    Okay.

9    A    And, and they had connections where they could get

10   drugs easy, they was cheap.  James found out about it.  He

11   knew about it.  He overheard a conversation a couple

12   times.  So, he wanted to get involved in it.  He got the

13   money.  He told me, "Come on.  Let's go."  So, we went.

14   Q    Where did he get the money from?

15   A    From my sister.

16   Q    Stephanie?

17   A    Yes.

18   Q    Where did that money come from?

19   A    I think maybe insurance, or something.  I'm not sure

20   exactly.

21   Q    How much money did he get?

22   A    He had $15,000.  That's what he said he had.

23   Q    Was that going to be the money used to buy the drugs?

24   A    Yes, sir.

25   Q    Did you have any money of your own?

K. Newton – Direct

1   A      No.

2   Q      So, why was he taking you with him?

3   A      Because I was the connection, and he wanted me to get

4   rid of the pills for him, supply him and pay for the

5   habit, the pills, too.

6   Q      Why don't you tell the jury what happened when you --

7   let me stop you.  Who was going to go with you to Ohio?

8   A      James.

9   Q      Who else?

10  A      Couple different girls wanted to go, but I didn't

11  take no girls with me.  Until one of them suggested I take

12  a different vehicle, and then I took a couple other people

13  with me, first a female and then another guy.

14  Q      Who was the female?

15  A      Katina.  Joe Bud Schuler.

16  Q      Did they know why you were going to Ohio?

17  A      One of them, the female did.  The male didn't have no

18  idea.

19  Q      Why didn't the male know?

20  A      He was just along for the ride.

21  Q      What was Katina supposed to be doing?

22  A      Driving, getting paid to drive.

23  Q      Why don't you tell the members of the jury what

24  happened on that trip.

25  A      What part?

K. Newton - Direct

```
 1   Q    Well, you left Virginia for Ohio, correct?
 2   A    Yeah.
 3   Q    Why don't you tell them what happened -- where did
 4   you go?
 5   A    I left Virginia, got to Ohio, to the female's house
 6   where they made a few phone calls and the people come in
 7   that had the drugs, and then James left with them to go
 8   get the drugs.  He give me the money to purchase them to
 9   start with, and I give it back to him, and he took off
10   with it.  And then they come back with the drugs, we went
11   out to a bar for a little while, and then we went to a
12   motel.  And then the same people that had the drugs come
13   by the motel and met us, and sold some more drugs, and
14   then the next day we came back to Virginia.
15   Q    What kind of quantities were you buying?
16   A    300 OxyContin eighties and some cocaine.
17   Q    How much does 300 OxyContin eighties go for?
18   A    $30,000.
19   Q    How much?
20   A    $30,000.
21   Q    Is that if you were selling them on the street --
22   A    No, I'd make $36,000 on the street.
23   Q    How much is an ounce of cocaine?
24   A    $1,000 an ounce.
25   Q    So, you were buying close to 30 some thousand dollars
```

1  in drugs?

2  A    Yeah.  They're $50 a pill.  We buy them $50 a pill,

3  and they sell for $100 a pill.  The street value is $120 a

4  pill.

5  Q    On the street you could sell that amount of pills for

6  $30,000, but you were buying them half price, so it cost

7  you about $15,000?

8  A    Yes.

9  Q    Did you see the money James had?

10 A    Yeah, he gave it to me at one point.

11 Q    What did it look like?

12 A    A chunk of money.

13 Q    Was it in cash?

14 A    Yeah.

15 Q    Again, where did he get that money from?

16 A    From my sister, is what he told me.

17 Q    Did he tell you why she gave him money?

18 A    It was just a gift to him from an insurance

19 settlement, or something.

20 Q    When you left Ohio did you come back to Southwest

21 Virginia?

22 A    Yes, sir.

23 Q    What did you do when you got back?

24 A    Went to my house.

25 Q    What did you do when you got to your house?

K. Newton - Direct

1   A    Put all the pills and the cocaine away until the next

2   morning.

3   Q    Then what happened the next morning?

4   A    People started coming by, and I was trying to make

5   some deals, and then James come by, he shot a couple of

6   beers, and zoom, other people come by.  And I was getting

7   ready to have a poker game, and then shortly after that I

8   got raided, the police showed up.

9   Q    When you say raided, a search warrant was executed,

10  you were arrested?

11  A    Yes, sir.

12  Q    James was arrested?

13  A    Yes, sir.

14  Q    Drugs were found?

15  A    Yes, sir.

16  Q    What kind of drugs were found at your apartment that

17  day, your house that day?

18  A    OxyContin and cocaine.

19  Q    Mr. Newton, I'm going to hand you what's been marked

20  as Government's Exhibits 16, 17, 18, 19 and 20.  Look

21  through those, please.  Do you recognize what those are

22  pictures of?

23  A    Yes, sir.

24  Q    What are those pictures of?

25  A    Syringe with cocaine and OxyContin, pictures of

K. Newton – Direct

 1  OxyContin, and pictures of baggies full of OxyContin.

 2  Q    Are these pictures of the items that were found at

 3  your home during that search warrant?

 4  A    Yes, sir.

 5            MR. LEE:  I move for admission of Government's

 6  Exhibit 16.

 7       (Government's Exhibit No. 16 was received in

 8  evidence.)

 9  BY MR. LEE:

10  Q    Tell the jury what that's a picture of.

11  A    That's cocaine.

12  Q    And then at the bottom of Government's Exhibit 16?

13  A    A used syringe that OxyContin been shot in.

14            MR. LEE:  Move Government's Exhibit 17, admission

15  of 17.

16            THE COURT:  It will be admitted.

17       (Government's Exhibit No. 17 was received in

18  evidence.)

19  BY MR. LEE:

20  Q    I show you that picture there.  Do you recognize what

21  that is?

22  A    Yes, sir.  It's money that I was busted with.

23  Q    That is your chair that they're in there?

24  A    Yes, sir.

25  Q    And then the other picture in Government's Exhibit

K. Newton – Direct

1    16?

2    A    A spoon and syringe that someone used to shoot

3    OxyContin with.

4    Q    Okay.  I'll show you Government's Exhibit 18, and

5    I'll move for the admission of Government's Exhibit 18.

6        (Government's Exhibit No. 18 was received in

7    evidence.)

8    BY MR. LEE:

9    Q    Top picture there, do you recognize what that is?

10   A    Yes, sir.  I believe it's a bag full of OxyContin.

11   That's a baggie full of OxyContin.

12   Q    Approximately how many OxyContins were in that bag?

13   A    Probably 190 in that bag.

14   Q    I'll show you Government's Exhibit 19, and I'll move

15   for its admission.

16       (Government's Exhibit No. 19 was received in

17   evidence.)

18   BY MR. LEE:

19   Q    Do you recognize what that is?

20   A    Yes, sir.  Crown Royal bag.

21   Q    What did you use that for?

22   A    To keep cocaine and OxyContin in.

23   Q    Finally, Government's Exhibit 20, I'll move for the

24   admission of Government's Exhibit 20.

25       (Government's Exhibit No. 20 was received in

K. Newton - Direct

1   evidence.)

2   BY MR. LEE

3   Q     Do you recognize what that is?

4   A     Yes.  It's a gram of cocaine.

5   Q     And also Government's Exhibit 20?

6   A     Joints of marijuana.

7           MR. LEE:  I'll move the admission of 16, 17, 18,

8   19 and 20, Your Honor.

9           THE COURT:  They will be admitted.

10  BY MR. LEE:

11  Q    Mr. Newton, after you were arrested and the search

12  warrant was executed at your residence, did you have some

13  concern about a gun that had been, or two guns that had

14  been in your possession on that day?

15  A     Yes, sir.

16  Q    Why don't you tell the members of the jury about

17  those two guns.  Where had you got them from?

18  A     There was one gun.

19  Q     One gun?

20  A     One gun.

21  Q     Why don't you tell the members of the jury about that

22  gun.

23  A     There was a guy come up, there's a man come up to

24  sell it to me that needed some money to buy some drugs

25  with.  I didn't want to purchase the gun.  I ended up with

K. Newton – Direct

1    it anyway.  There was a female in my house that wanted to

2    go with her boyfriend.  The gun ended up on the outskirts

3    of my property in the trunk of a car that I used to own

4    that tore up.  Three days after that the police received

5    the gun from the female and the guy, and told them it was

6    my gun.  So, that's what happened for the gun.

7    Q    Wasn't there another gun that you were concerned

8    about, also?

9    A    I thought it was a different gun, but it had me

10   confused, I thought it was three guns, but there was one

11   gun that the police ended up with.

12   Q    Do you remember talking on the phone to Stephanie

13   about those guns, and where they were, and who had them,

14   and things like that when you were in jail?

15   A    There was one gun that I had got charged with, then

16   there was another gun that my sister had that I asked her

17   about did she have it because I thought it was the same

18   gun.  That was a different gun.  It wasn't the gun that I

19   got charged with.

20   Q    You all were talking in code on the phone, weren't

21   you?

22   A    Maybe.  I'm not sure.  Possibly, yes.

23   Q    Do you remember referring to it as a lug wrench or

24   shiny thing?

25   A    Shiny thing probably was the gun.

K. Newton - Direct

```
 1   Q     And you talked to other people about that?
 2   A     Yes, sir.  The lug wrench was an actual lug wrench
 3   and tools and stuff in my car that this female was
 4   supposed to got out of the car.
 5   Q     Who was that?
 6   A     Lisa Combs.
 7   Q     When you were talking about the shiny thing, what
 8   were you wanting Stephanie to do?
 9   A     Nothing, really.  I just wanted to know whether she
10   had it, or not, whether I really got trapped up with a gun
11   that I shouldn't have had.  I didn't have no idea whether
12   they had the gun that I got charged with, or whether it
13   was really a gun.  I needed to know.
14   Q     All right.  And you know those phone calls were, were
15   recorded at the regional jail, right?
16   A     Yes, sir.
17             MR. LEE:  Your Honor, at this point we have a
18   couple different recorded phone calls I'd like to play for
19   the jury.
20             THE COURT:  All right.
21             MR. LEE:  I have transcripts, also.
22             THE COURT:  Ladies and gentlemen, you're going to
23   be handed transcripts that purport to be of an audio sound
24   recording, and I need to tell you that the sound recording
25   is actually the evidence in this case.  The transcript is
```

K. Newton – Direct

```
 1  not evidence; it's given to you only for your convenience
 2  in following the recording, what you hear.  And if there is
 3  a disagreement between the recording which you hear, and
 4  the transcript, you need to follow what you hear.
 5  Similarly, if you cannot hear, you can't understand it,
 6  then that's the evidence that you have to consider, and the
 7  transcript is not going to be admitted into evidence.
 8  Let's see, you need one more?
 9  BY MR. LEE:
10  Q    One other thing Mr. Newton.  When you were in jail
11  and talking to Stephanie, did you also have some
12  conversations with her about James and his drug use?
13  A    Possibly, yes.
14  Q    Specifically related to liquid morphine?
15  A    Yes, sir.
16  Q    What were those conversations about?
17  A    I can't recall right off hand.  It had something to
18  do with my fault because he been strung out on morphine,
19  something to that effect.
20  Q    Had he been using liquid morphine with you at your
21  house?
22  A    I've never used morphine, I've never used a needle.
23  Q    In your presence?
24  A    Yes, sir.
25  Q    Was she upset about that?
```

K. Newton – Direct

```
 1   A     Yes, sir, she blamed me over it.
 2           MR. LEE:  Just for the record, that is a phone
 3   call from Tuesday, December, it's on a CD marked as
 4   Government's Exhibit Nine.  On Tuesday, October 27, 2009.
 5         (A digital audio recording was played in open court:)
 6           K. NEWTON:  Hey, what are you doing?
 7           S. NEWTON:  Losing my mind.  What are you doing?
 8           K. NEWTON:  I'm losing mine, too.  I just got out
 9   of lock down.  I've been in lock down since I left.  I just
10   got out about five minutes ago.  What's the babies crying
11   for?
12           S. NEWTON:  She wants out of the playpen.
13           K. NEWTON:  Huh?
14           S. NEWTON:  She's wanting out of the playpen.
15           K. NEWTON:  Oh, well let her out.
16           S. NEWTON:  I'm trying to load her up in the car
17   and take her to the house.
18           K. NEWTON:  Where you at?
19           S. NEWTON:  I'm at Thelma's.
20           K. NEWTON:  Where's James at?
21           S. NEWTON:  Hell if I know.
22           K. NEWTON:  Damn, I ain't been able to call
23   nobody in a couple of days since I left the jail.
24           S. NEWTON:  Yeah.
25           K. NEWTON:  I don't know what all is going on.
```

K. Newton – Direct

```
 1   Have you heard anything?
 2            S. NEWTON:  No, not been much communication.
 3            K. NEWTON:  Huh?
 4            S. NEWTON:  No, Lisa don't call me; she calls
 5   James.
 6            K. NEWTON:  I know.  I don't know James' number.
 7            S. NEWTON:  I don't know if it'll go through, but
 8   it's 5499.
 9            K. NEWTON:  5499?
10            S. NEWTON:  Yeah.
11            K. NEWTON:  What's the other numbers?
12            S. NEWTON:  Same as mine.
13            K. NEWTON:  Uh, 708?
14            S. NEWTON:  Yeah.  Chelsea --
15            K. NEWTON:  Uh --
16            S. NEWTON:  -- quit it.
17            K. NEWTON:  I think Lisa was suppose to went to
18   court yesterday or today, one, but I can't get ahold of
19   her.  It still ain't cleared on her phone yet.
20            S. NEWTON:  Oh, I don't know.
21            K. NEWTON:  Have you, there ain't nobody said
22   nothing about my bond hearing, or nothing?
23            S. NEWTON:  Not that I know of.  They communicate
24   among themselves.  They don't tell me nothing.
25            K. NEWTON:  Well, why don't you never ask?
```

K. Newton – Direct

```
 1              S. NEWTON:  What the hell am I gonna ask?

 2              K. NEWTON:  I don't, whatever's going on.  You

 3    got to tell me something, or they got to tell you

 4    something.  I know one thing, I was suppose to been down

 5    there today for a possible hearing, and they shut me up and

 6    moved me up there, screwed me all up.  I ain't been able to

 7    call nobody or nothing since I got here.  Because it's been

 8    on lock down.  The whole penitentiary has, or the jail,

 9    whatever it is.  And that --

10              S. NEWTON:  So they had you in booking?

11              K. NEWTON:  Yeah.  Yeah.  I was in lock down, I

12    told you.  I just now got out just about five, six minutes

13    ago.  Damn, they gave me a headache.  They wouldn't let me

14    out to call my lawyer, or nothing.  Then they, this

15    morning, my lawyers faxed some papers here and they brought

16    them around there to get me to sign them.  I couldn't

17    hardly read them to make nothing out of it.  See, I told

18    you I was suppose to went this morning for something.  I

19    don't know what it was, though.  A bond hearing.  But

20    Monday morning everybody's got to be there for real.

21              S. NEWTON:  Alice is coming in for that.

22              K. NEWTON:  Yeah, she better be there Monday

23    morning for real now.  When I get off here will you call

24    her and tell her that?  Tell her that I got to get

25    everything squared away with the house, with her, with
```

K. Newton – Direct

1   everything, you know.

2           S. NEWTON:  Yeah, I'll tell her. And James,

3   what's he doing?  I don't know what he's doing.  Where's he

4   at?  Running the road.  Said he'd be home in a little bit.

5   Yup.  He detoxed off all that shit.

6           K. NEWTON:  Huh?

7           S. NEWTON:  Huh?

8           K. NEWTON:  He did, didn't he?

9           S. NEWTON:  Huh?

10          K. NEWTON:  Huh?  He did, didn't he?

11          S. NEWTON:  Yeah, he detoxed when he came out of

12  jail.  All that shit you was telling me he wasn't on.

13          K. NEWTON:  Yeah.

14          S. NEWTON:  Yeah, he come off it.

15          K. NEWTON:  Well, he told me he was.  He give me

16  his word.

17          S. NEWTON:  Keeping his word, my ass.  I asked

18  you three separate times if he was using, and all three

19  times you lied to me.

20          K. NEWTON:  No, not that stuff he wasn't.

21          S. NEWTON:  Yeah, that stuff he was doing.

22          K. NEWTON:  No, he wasn't.

23          S. NEWTON:  The hell he wasn't.  He was shooting

24  it in his arm.

25          K. NEWTON:  Not when he was with me, Steff, he

K. Newton – Direct

```
 1   wasn't.

 2             S. NEWTON:  Well, he was shooting it and had been

 3   for over a month.

 4             K. NEWTON:  He told me he'd been trying it, but I

 5   never did see him do it.

 6             S. NEWTON:  He said it started out with liquid

 7   morphine at your house.

 8             K. NEWTON:  Yeah.  That was the last time you

 9   asked me if he do anything, and I told you no.  And then he

10   wanted to try that stuff cause of Joe.  That's the only

11   reason he tried it, I believe.

12             S. NEWTON:  Well, he's a sorry motherfucker, too.

13             K. NEWTON:  Well.

14             S. NEWTON:  Because I asked him and he lied to

15   me.

16             K. NEWTON:  I know.

17             S. NEWTON:  And that whore he's with is saying

18   she's been sleeping with James when he was in the halfway

19   house.

20             K. NEWTON:  Yup.  You know how they are, Steff.

21   That's just, that's just the way it is.  When they're using

22   something like that they ain't gonna tell you.  They can't.

23             S. NEWTON:  Well, she ain't gonna have to worry

24   about Joe beating her fucking brains out because I'm gonna

25   do it for her come tomorrow evening when I get my hands on
```

K. Newton – Direct

```
 1   her.
 2              K. NEWTON:  Where's she at?
 3              S. NEWTON:  Up there living in your house.
 4              K. NEWTON:  Ah, hell, no.
 5              S. NEWTON:  Yeah.  Sleeping in your bed.  How
 6   does that suit you?
 7              K. NEWTON:  That goddamn whore.  You give them a
 8   message for me, will you?
 9              S. NEWTON:  What's that?
10              K. NEWTON:  Tell them I'll be home MOnday and I
11   expect them to be out of my house.
12              S. NEWTON:  They've done took it over.
13              K. NEWTON:  No, they ain't took nothing over.  If
14   I make a bond I'll show you who's taking over.
15              S. NEWTON:  The night you went in, that very next
16   morning.
17              K. NEWTON:  Yeah.  Well, they know what time it
18   is when I come home.  Won't get to stay home long, though.
19   They're gonna have our trial December the 16th.
20              S. NEWTON:  I know it.
21              K. NEWTON:  At least it'll give me time to get
22   the house straightened out and everything the way it's
23   supposed to be before I got to go, you know?
24              S. NEWTON:  Yeah.
25              K. NEWTON:  That's something I got to take care
```

K. Newton – Direct

1   of, get my teeth fixed and my hand fixed, and I'll be all

2   right.  I'll be good to face anything.

3            S. NEWTON:  Well, Joe's liable to be in there

4   with you 'cause he liked to kill her the other night.

5            K. NEWTON:  Did he?

6            S. NEWTON:  Jason pulled him off her.

7            K. NEWTON:  Is Jason staying over there, too?

8            S. NEWTON:  No.  He was just over there.

9            K. NEWTON:  Oh.

10           S. NEWTON:  When Joe was beating the hell out of

11  her and he pulled him off of her.

12           K. NEWTON:  Yeah.  Did she take a warrant for

13  him?

14           S. NEWTON:  No.  Threatened to.

15           K. NEWTON:  Hey, will you do me -- what's Thelma

16  doing?

17           S. NEWTON:  Sitting here rocking my young 'un.

18           K. NEWTON:  Tell her I'm gonna need her down

19  there Monday, too.  So, bring her damn car titles and

20  everything.

21           S. NEWTON:  I'll tell her.

22           K. NEWTON:  Will you tell her?

23           S. NEWTON:  I'll tell her.

24           K. NEWTON:  Promise me now.  I need these people

25  down there for real.  I need support behind me, you know,

K. Newton – Direct

1   when I'm going up there.

2          S. NEWTON:  Well, all I can do is tell them, Ken.

3   I can't make them show up.

4          K. NEWTON:  Tell them I'll, I'll beat them if

5   they don't.

6          S. NEWTON:  You ain't in no position to be

7   threatening.

8          K. NEWTON:  I ain't.  I'm just bullshitting.

9          S. NEWTON:  Like I said, you ain't in no

10  position.

11         K. NEWTON:  Yeah, I know.  Hey, will you do me a

12  favor, though, for real?  Will you call Lisa and, and tell

13  her I tried to call her but I couldn't get through?  I've

14  been on lock down and everything else, and when I did try

15  to call her I couldn't get through.  It won't take it.

16         S. NEWTON:  I'll tell her.

17         K. NEWTON:  (Inaudible.)

18         S. NEWTON:  She ain't nothing but trouble, you

19  know that.

20         K. NEWTON:  I know this, Steff, but I got to

21  count on her for right now.  I have to.  I'll explain it to

22  you later.  Her and Summer, both, I have to count on them.

23  There's some things that went wrong, and, and they can make

24  it right, you know.

25         S. NEWTON:  I hear you.

K. Newton - Direct

```
 1              K. NEWTON:  You ain't paying attention to me,

 2   though.

 3              S. NEWTON:  I know what you're talking about when

 4   it comes to Lisa.  I don't know what the hell play Summer's

 5   got in it, but I know what you're talking about with Lisa.

 6              K. NEWTON:  What is it about her?  Oh, you know.

 7   Okay.  See both of them's wanting to help me, they're

 8   wanting to do anything, anything that I want them to do or

 9   need them to do to help me out of this mess.  And, and

10   they're ready to do it, you know.  And I'm just keeping

11   that open in case something does happen.  You understand

12   what I'm saying?

13              S. NEWTON:  Yeah.

14              K. NEWTON:  Okay.  Tell James I, I, well, I don't

15   know what to tell him.  I thought he had your telephone.

16              S. NEWTON:  Well, he did up until today.

17              K. NEWTON:  Why did you take it back for?

18              S. NEWTON:  I didn't.  I had to hurry up and get

19   to work.

20              K. NEWTON:  Oh.

21              S. NEWTON:  I had to go one way and he had to go

22   another.  I've been at work.  I just now got off.

23              K. NEWTON:  Tell him I said thanks a lot, too,

24   when you see him.  He lied to me about this place.  They

25   sent me to a place, they don't only lock down here all the
```

K. Newton – Direct

1  time, they stay locked down 22 hours a day.  That's a lot

2  of lock down.

3          S. NEWTON:  Hell, he probably didn't even know.

4  He ain't been in a regional in over five years.

5          K. NEWTON:  I know.  He told when he was gonna

6  transfer up here said it was a real good place.  I said,

7  oh, god.

8          S. NEWTON:  Abingdon.

9          K. NEWTON:  Huh?

10          S. NEWTON:  Abingdon --

11          K. NEWTON:  No.  No.

12          S. NEWTON:  -- facility.

13          K. NEWTON:  Well, I didn't, why did they send me

14  here?

15          S. NEWTON:  I don't know.

16          K. NEWTON:  Haysi.  Listen, I think we get out

17  about 9:00 in the morning and then we get out about, you

18  know, for like 30 minutes or an hour, and then at 1:00 or

19  2:30 for an hour.  Tell James I'm gonna call him on your

20  telephone 'cause I know I can't get ahold of him on his.

21          S. NEWTON:  Well, I'll leave the phone with him

22  tomorrow 'cause I got to go to work.

23          K. NEWTON:  Will that be all right?

24          S. NEWTON:  Yeah.

25          K. NEWTON:  I appreciate it.  Are you doing okay?

K. Newton – Direct

1  S. NEWTON:  I'm pissed off, but I'm all right.

2  K. NEWTON:  What are you pissed off about?

3  S. NEWTON:  What am I pissed off about?

4  K. NEWTON:  What?  I didn't do nothing.

5  S. NEWTON:  Have you lost your damn mind?

6  K. NEWTON:  What did I do?

7  S. NEWTON:  I asked you three damn times if he

8  was using, and you lied to me all three times.

9  K. NEWTON:  He wasn't doing it then, Steff, I'm

10  telling you.

11  S. NEWTON:  And he thinks I'm a damn fool that I

12  wouldn't know what withdrawal looks like.

13  K. NEWTON:  He wasn't doing it when you asked me.

14  I'm telling you for real.

15  S. NEWTON:  He's been doing it for over a month.

16  K. NEWTON:  No, he ain't.  How long have I been

17  locked up?  A week, two weeks?

18  S. NEWTON:  He's been nodding out for the last

19  month, or something.

20  K. NEWTON:  Ah, he's just wore out, or something.

21  He ain't been on that garbage that long, I'm telling you.

22  S. NEWTON:  Oh, bullshit.

23  K. NEWTON:  Steff, I know.  I'm the one that had

24  it.

25  S. NEWTON:  I know you're the one that had.  And

K. Newton – Direct

```
 1   that liquid morphine out at your place is what started it
 2   all.  Covering for him didn't help him.
 3           K. NEWTON:  Huh?
 4           S. NEWTON:  Covering for him didn't help him.
 5           K. NEWTON:  I wasn't covering for him.  He just
 6   got started.  I'm telling you.
 7           S. NEWTON:  He don't know how close he was for me
 8   telling him to get the fuck out and keep going.
 9           K. NEWTON:  I know it.  I can imagine.
10           S. NEWTON:  He started moving his stuff there the
11   other night.
12           K. NEWTON:  Did he?  Were you all fighting?
13           S. NEWTON:  Well, we ain't exactly playing nice.
14           K. NEWTON:  Well, don't be fighting right now.
15   Goddamn, this is a bad time to do it, Steff.
16           S. NEWTON:  When I get him and Amy together the
17   truth is gonna come out and when it comes out that he slept
18   with her he's getting his shit and going.  Because if he
19   slept with her he was with her the same time I was pregnant
20   carrying his son.  He could have given me something that
21   killed me and that young 'un.
22           K. NEWTON:  Well, why don't you wait until Monday
23   so I can get out of here on bond and I'll help you handle
24   everything that you need to handle cause they're, they're
25   leaving my house.  Okay.
```

K. Newton - Direct

 1              S. NEWTON:  They're what?

 2              K. NEWTON:  They're leaving my house.  Amy.

 3              S. NEWTON:  I'm gonna bust her face for her.

 4              K. NEWTON:  That's why I said wait 'till Monday

 5    so I can get out of here.  I'll be there.

 6              S. NEWTON:  Either she been with my old man or

 7    she's lying about it.  Either way, that, that constitutes a

 8    face busting.

 9              K. NEWTON:  Yup.  I have it took care of myself

10    if you give ma chance to get out of here, but right now it

11    ain't good to be fighting around, you know.  Ask Thelma is

12    she ready to come see me Monday.

13              S. NEWTON:  He wants to know if you're gonna be

14    down there Monday.  She said yeah.

15              K. NEWTON:  Tell her she better be.  Hey, ask her

16    is -- I'm real curious about something, and I don't know

17    how to say it, either.  Ask her if she still have that

18    shiny thing that her and Byrd had.

19              S. NEWTON:  Do you still got that shiny thing you

20    and Byrd had?  Yeah.

21              K. NEWTON:  Is she positive without a doubt?

22              S. NEWTON:  Are you sure?  She's positive.

23    BY MR. LEE:

24    Q    Just to stop a second, Mr. Newton.  Is that the gun

25    you were talking about earlier?

K. Newton – Direct

```
 1   A     Yes.

 2   Q     Which gun was that?

 3   A     That one.

 4             MR. LEE:  All right, we'll continue.

 5         (A digital audio recording was played in open court:)

 6             K. NEWTON:  I mean really positive.

 7             S. NEWTON:  She said yeah.

 8             K. NEWTON:  The twin to it showed up.

 9             S. NEWTON:  Its twin showed up.  She's asking

10   where?

11             K. NEWTON:  Donnie McKnight gave it to the

12   police.

13   BY MR. LEE:

14   Q     Just to stop it again, the twin, what's that a

15   reference to?

16   A     He came to my house, that was one gun that I actually

17   saw a week earlier, that Byrd had that he took to my

18   sister, and I thought she had the gun.  I thought I was

19   being set up, and I actually was in the long run, but it

20   ended up being the same gun.  I thought it was two guns.

21   Q     And then Donnie McKnight turned in a gun?

22   A     Yes, sir.

23   Q     Is that the gun you got busted with?

24   A     Yes, sir.  That's the gun he turned in, and I got

25   charged with.
```

K. Newton – Direct

```
 1   Q    Okay.

 2        (A digital audio recording was played in open court:)

 3            S. NEWTON:  Donnie McKnight gave it up.

 4            K. NEWTON:  He stole it.

 5            S. NEWTON:  He stole it?

 6            K. NEWTON:  And then give it to the police.

 7            S. NEWTON:  Stole it and handed it over.

 8            K. NEWTON:  That's why I wanted you to call Lisa,

 9   Steff, so you can give me a rundown on what's going on.

10   And tell James so I can talk to him tomorrow about it.

11            S. NEWTON:  Okay.

12            K. NEWTON:  You understand now what I was talking

13   about?

14            S. NEWTON:  Yeah.

15            K. NEWTON:  Okay.  It's important to me, for

16   real.  So will you call her when I hang up?

17            S. NEWTON:  Yeah.

18            K. NEWTON:  Now she's supposed to be staying at

19   Katina's.

20            S. NEWTON:  I know.

21            K. NEWTON:  You know that number?

22            S. NEWTON:  Yeah.

23            K. NEWTON:  Thirty, 3771.

24            S. NEWTON:  It's hard not to know where she is

25   when she's calling James every so often.
```

K. Newton – Direct

1          K. NEWTON:  Well, I have her do that 'cause that,

2     you know, you're always busy at the jail and stuff.  I

3     can't have, be calling there.  I got to have somebody to

4     contact.  Besides, James is a pretty good dude, Steff, for

5     real.  Tell her to quit nagging.

6          S. NEWTON:  Yeah, a pretty good dude just lies

7     like hell to me, with me for over a month.

8          K. NEWTON:  With what?

9          S. NEWTON:  Lying like hell to me, yeah, that

10    makes him pretty good.

11         K. NEWTON:  Me lying to you?  I don't lie to you,

12    Steff.  I told you straight.

13         RECORDED MESSAGE:  You have one minute remaining

14    for this call.

15         K. NEWTON:  Just got one more minute.  He didn't

16    do that, Steff, 'till the last time you asked me about it.

17    I promise that's the truth.

18         S. NEWTON:  And why didn't you tell me then?

19         K. NEWTON:  I didn't know it 'till later.  Joe's

20    the one that done it, and that's when I found out.

21         S. NEWTON:  He's a sorry motherfucker, too.

22         K. NEWTON:  Well, don't panic too much.  I love

23    you and I'll try to call tomorrow.  Okay?

24         S. NEWTON:  All right.

25         K. NEWTON:  You take care of the babies and take

K. Newton – Direct

1    care of yourself.  And I love you all.

2              S. NEWTON:  Love you, too.

3              K. NEWTON:  I'll see you Monday.

4              S. NEWTON:  All right.

5              K. NEWTON:  Okay.  Bye.

6              S. NEWTON:  Bye.

7              MR. LEE:  Your Honor, there's one more phone

8    conversation.

9              THE COURT:  All right.  Ladies and gentlemen, if

10   you'll pass this transcript to your left, and the court

11   security officers will pick it up, and then you'll get

12   another one.

13             MR. LEE:  Your Honor, this is another phone

14   conversation on October 27, 2009.  It's also been recorded

15   onto Government's Exhibit Nine.  We're going to actually

16   start at seven minutes and 31 seconds into the phone call,

17   which is on page eight of the transcript.  We'll start

18   approximately midway down the page.

19      (A digital audio recording was played in open court:)

20             K. NEWTON:  I'm getting pissed off 'cause I can't

21   make, uh, uh, Summer or Lisa do what I need them to do.

22   Things going wrong on that end.  You know how, what I'm

23   talking about.

24             S. NEWTON:  Uh-huh.  Well, I told you they wasn't

25   worth a damn.

K. Newton – Direct

1              K. NEWTON:  I know.  I know.  Did you talk to

2    Thelma about that thing I was asking you about last night

3    for sure, positively?

4              S. NEWTON:  She said she's sure and she's

5    positive.

6              K. NEWTON:  Make her make sure, Steff, 'cause I'm

7    gonna get you and her to do something.

8              S. NEWTON:  All right.

9              K. NEWTON:  Will you do that for me?

10             S. NEWTON:  Yeah.

11             K. NEWTON:  Make her make sure.  It's really

12   important.  I can't call a shot unless I know for sure by

13   you.

14   BY MR. LEE:

15   Q    Mr. Newton, what were you talking about in that

16   portion of the conversation?

17   A    I really can't recall.

18   Q    Was it in reference to the gun again?

19   A    That's what I was talking about, the gun.  I don't

20   remember what I was talking about the gun.

21   Q    You don't remember what you were going to ask them to

22   do?

23   A    If I read more --

24   Q    Well, I'm going to continue playing.

25        (A digital audio recording was played in open court:)

K. Newton – Direct

```
 1              K. NEWTON:  Okay.  I love you.

 2              S. NEWTON:  I love you, too.  You want James?

 3              K. NEWTON:  Yeah.

 4              S. NEWTON:  All right.

 5              K. NEWTON:  All right.  Bye.

 6              S. NEWTON:  Bye.

 7              J. CRABTREE:  Hey.

 8              K. NEWTON:  What you doing now?

 9              J. CRABTREE:  Sitting here in the van.

10   BY MR. LEE

11   Q    Is that James Crabtree you're talking to now?

12   A    Yes, sir.

13        (A digital audio recording was played in open court:)

14              K. NEWTON:  (Inaudible) Tobacco Festival.

15              J. CRABTREE:  (Inaudible.)

16              K. NEWTON:  Is that what it is?

17              J. CRABTREE:  Yeah.  Yeah.  We walked around a

18   little bit.  The damn wind about too rough.

19              K. NEWTON:  Yeah.  Hey, do me a favor.  I know

20   this is hard for you to do, but I need you to call Lisa

21   whenever you can and tell her I'm sorry, that I love her

22   and I'm sorry about her brother, and everything.  I don't

23   know what to say.  You know, I ain't got no words for stuff

24   like that.

25              J. CRABTREE:  I hear you.
```

K. Newton – Direct

1              K. NEWTON:  Now I don't know if she'll be there

2    Monday, or not.  I, I don't know.  I have no idea.  But

3    tell her no matter what she does, do not get back with that

4    Donnie guy.  You know what I'm saying?

5              J. CRABTREE:  Yeah.

6              K. NEWTON:  You know what you and me talked

7    about?

8              J. CRABTREE:  Yeah.

9              K. NEWTON:  While you was, while you was with me?

10             J. CRABTREE:  Yeah.

11             K. NEWTON:  About Thelma and Steff calling and

12   doing something.

13             J. CRABTREE:  Yeah.

14             K. NEWTON:  I'm thinking about getting them to do

15   it.  I just made my mind up.

16             J. CRABTREE:  I hear you.

17             K. NEWTON:  But make Thelma check and make sure.

18   Okay?

19             J. CRABTREE:  All right.  I'll, I'll see what I

20   can do (inaudible) --

21             K. NEWTON:  Steff will know what I'm talking

22   about.  Talk to her about it as soon as I hang up.

23             J. CRABTREE:  Well --

24             K. NEWTON:  Okay.

25             J. CRABTREE:  Yeah.

K. Newton – Direct

```
 1            K. NEWTON:  And what it is, one of them left them

 2  in that car I gave Alice a few years ago.  You got me?

 3            J. CRABTREE:  Yeah.

 4            K. NEWTON:  And that boy stole it out of it, out

 5  of that blue car that I gave Alice two years ago.

 6            J. CRABTREE:  Yeah.

 7            K. NEWTON:  You got it?

 8  BY MR. LEE:

 9  Q    Mr. Newton, does that refresh your recollection a

10  little bit?

11  A    Yes.

12  Q    What were you talking about?

13  A    It was the gun that I got charged with.  I believe I

14  had a conversation with James about turning the gun in to

15  the police or having the police get it.  I'm not positive.

16  Q    When you stated that, "Steff will know what I'm

17  talking about; talk to her about it as soon as I hang up,"

18  that's in reference to the gun?

19  A    Yeah.

20  Q    And about what you were planning on trying to do to

21  get rid of this thing?

22  A    The gun?

23  Q    Yeah.

24  A    Yeah.

25  Q    Okay.
```

K. Newton – Direct

1      (A digital audio recording was played in open court:)

2          J. CRABTREE:  Yeah.

3          K. NEWTON:  Repeat that.

4          J. CRABTREE:  That blue car you give Alice two

5    year ago he stole it out of.

6          K. NEWTON:  Right.  You got it.

7          J. CRABTREE:  Yeah.

8          K. NEWTON:  That's all I need to say.

9          J. CRABTREE:  Yeah.

10         K. NEWTON:  And they know what to do on the rest.

11   I didn't know nothing about it.  Right.

12         J. CRABTREE:  Right (inaudible).

13         K. NEWTON:  Cause Alice was in the day before I

14   got to see her, you know.

15         J. CRABTREE:  Yeah.

16         K. NEWTON:  You know what I'm saying?

17         J. CRABTREE:  Yeah.

18         K. NEWTON:  And that's when she left it there.

19   BY MR. LEE:

20   Q    Your Honor, I think that's all we need to play of

21   that.  I'll move for Government's Exhibit Nine.

22         THE COURT:  It will be admitted.  Ladies and

23   gentlemen, if you could just pass your transcripts to your

24   left, if you will.

25      (Government's Exhibit No. 9 was received in evidence.)

K. Newton – Direct

```
 1   BY MR. LEE:
 2   Q    Mr. Newton, just to be clear on this, there's a car
 3   on your property?
 4   A    Yes, sir.
 5   Q    A blue car?
 6   A    Yes, sir.
 7   Q    That you had put a gun in the trunk?
 8   A    Myself and this girl, Lisa, put it in the trunk.
 9   Q    Donnie McKnight got the car, it out of that car?
10   A    After I got arrested, Lisa and her boyfriend, Donnie
11   McKnight, come up to my house and took the gun out of the
12   car.  They took a lot of stuff from my house and the car.
13   The reason I was talking the way I was, at this time I
14   didn't know if the police had the gun.
15   Q    You were trying to figure out what to do with that
16   gun?
17   A    I didn't want to be charged with it.  I didn't have
18   no use for it.
19   Q    That's what you were trying to communicate to
20   Stephanie and also to James?
21   A    Right.  Get rid of it so I wouldn't be fooling with
22   it, no way.
23   Q    They knew what you were talking about?
24   A    I think so.  I hoped so.
25   Q    You stated on the phone call that James knew, right?
```

K. Newton – Direct/Cross

```
 1   A    Right.
 2           MR. LEE:  Your Honor, at this time I don't have
 3   any further questions of this witness.
 4           THE COURT:  Mr. Chafin?
 5                   CROSS EXAMINATION
 6   BY MR. CHAFIN:
 7   Q    Good afternoon, Mr. Newton.  My name is Ben Chafin,
 8   and I represent Stephanie Newton.  You, you, sir, have
 9   made quite a career for yourself, haven't you?
10   A    Yes, sir.
11   Q    And you're real meek about it today, but when you're
12   out there running wide open you're not too meek about it,
13   are you?
14   A    No, sir, I'm not.
15   Q    And you, you, sir, have got 22 years to serve, don't
16   you?
17   A    Yes, sir, I do.
18   Q    You're not too happy about that, are you?
19   A    No, sir, I'm not.
20   Q    In fact you're blue as a possum, aren't you?
21   A    Yes, sir.
22   Q    It makes you upset that justice finally caught up to
23   you?
24   A    If that's the way you look at it, yes.
25   Q    And you'd like to get another little shot at that
```

K. Newton - Cross

1   justice, wouldn't you?  You'd like to have that sentence

2   reduced.  Wouldn't you?

3   A    I'd love to.

4   Q    That's what this is all about; that's what you're

5   here for?

6   A    No, I'm not here for a sentence reduction.

7   Q    That's not scheduled today, but that's what you're

8   here for in the hopes that there will be one down the

9   road?

10  A    I'm always in hopes.

11  Q    Absolutely.

12  A    Yes.

13  Q    And you're always coming up with something to try to

14  see that through, aren't you, to see that happen?

15  A    Possibly, yes, sir.

16  Q    Now, you've got, you've got a long history here of

17  working with Special Agent Levesque, don't you?

18  A    Somewhat, yes.

19  Q    Well, long before you went up there to Ohio and you

20  got yourself busted when you come home, you done got

21  yourself busted before that, hadn't you?

22  A    Absolutely.

23  Q    When did that happen?

24  A    I believe it might have been July 15th.

25  Q    Some four months before you went and got yourself

K. Newton - Cross

 1  busted again?

 2  A    At that time I was trying to work with the FBI.

 3  Things went bad.  So, yes, sir, four months before that,

 4  yes, sir, I got busted.

 5  Q    Well, you got busted once before, in July, and you

 6  were going to work with the ATF, with Agent Levesque?

 7  A    Absolutely.

 8  Q    Were you going to be what is called a cooperating

 9  informant?

10  A    Yes, sir.

11  Q    Means you were going to sit there and tell on people?

12  A    That's correct.

13  Q    And you interviewed with Agent Levesque on July 17th?

14  A    Yes, sir.

15  Q    And at that time you gave Agent Levesque the name of

16  a whole lot of people that you were involved in the drug

17  business with; is that correct?

18  A    Yes, sir.

19  Q    And of those people you named -- I mean, are we

20  talking more than a dozen?

21  A    Close.

22  Q    But you didn't mention anything about your sisters,

23  now, did you?

24  A    I'm not sure.

25  Q    Not sure?

K. Newton – Cross

```
 1   A    You'd have to read their files.  I'm not sure.

 2   Q    Well, Agent Levesque will tell us about that.  Now,

 3   how come you didn't get to continue as a cooperating

 4   informant with the ATF?

 5   A    Because things went bad for me.

 6   Q    Well, things never got good for you, did they?

 7   A    Well, I had plans on things getting real good for me,

 8   the day that I did get arrested and got raided, at that

 9   time I was getting a phone number brought from one of my

10   female friends so I could contact them and let them know

11   that I would probably make the biggest bust in the history

12   of Lee County at that time that day, but I never got

13   around to it, it never happened.

14   Q    Well, let me ask you this.  You, you were running

15   some kind of an operation where drugs were being brought

16   up from Florida; is that right?

17   A    Yes, sir.

18   Q    You all had some doctors down there that were writing

19   prescriptions freely, right?

20   A    No, some people I know had some doctors down there.

21   Q    And that's some of the people you were telling on.

22   Now, are you sure that you don't remember that you didn't

23   mention Stephanie Newton?

24   A    I just told you I'm not sure.

25   Q    Now, Agent Levesque was supervising you as a
```

K. Newton - Cross

1   cooperating informant, wasn't he?

2   A    Somewhat, yes, sir.

3   Q    Right.  And part of being a cooperating informant is

4   you have to be honest with your dealers, don't you?

5   A    To some extent, yes.

6   Q    Well, I mean, it's not to some extent.  You signed an

7   agreement to do this, didn't you?

8   A    Yes, sir.

9   Q    And that is a contract between you and the Alcohol

10  Tobacco and Firearms and Explosives Department for you to

11  be honest and truthful with them; is that right?

12  A    Absolutely.

13  Q    And you weren't, were you?

14  A    To some extent, yes, sir, I was.

15  Q    Well, it all blew up on you because you weren't

16  honest with them, were you?  You were still into the drug

17  trafficking?

18  A    Choir boys can't make busts.  You can't clean the

19  streets up if you're going to be in the church.

20  Q    That was part of your contract that, you weren't to

21  be using drugs?

22  A    Absolutely.

23  Q    And you absolutely didn't do that, did you?

24  A    Most of the time, yes.

25  Q    Most of the time?

K. Newton - Cross

```
 1   A     Yes, sir.

 2   Q     But were you dishonest about that with Agent

 3   Levesque, Special Agent Levesque?

 4   A     No, I didn't let him know either way.

 5   Q     Okay.  So, you were not dishonest with him because

 6   you didn't let him know either way, but you were still

 7   breaking your contract, right?

 8   A     How was I breaking my contract?

 9   Q     Well, wasn't your contract that you were not to use

10   drugs if you were working for the ATF, you were not

11   supposed to be using drugs, correct?

12   A     I guess you might say I went out of my own

13   jurisdiction to make this happen at that time.  Whether it

14   was right or wrong, that's beside the point.

15   Q     Would you answer that question?  Were you under a

16   contract with the ATF to not use illegal substances?

17   A     I probably was.

18   Q     And did you use illegal substances?

19   A     I probably did.

20   Q     Were you honest with Agent Levesque?

21   A     As far as I can remember I was except the part where

22   you said I signed a contract not to use drugs.

23   Q     Well, why did Agent Levesque, why did he decide that

24   he could no longer use you because you weren't

25   controllable?
```

K. Newton - Cross

1    A    I told you, things went bad.

2    Q    Tell me about it.  What went bad?

3    A    That's when the police come and raided me, busted me,

4    as soon as I got back in town.

5    Q    Right.  Here you are, you're cooperating with ATF,

6    and you're going up to, and you're going up to Ohio to buy

7    a quantity of OxyContin, correct?

8    A    Mr. Levesque had no idea what I was doing at that

9    time.

10   Q    And because he didn't know, you didn't feel like you

11   were being dishonest with him?

12   A    Well, if I let him know that, then I wouldn't have

13   been able to do what I done.  He wouldn't have agreed with

14   me.

15   Q    Mr. Newton, you met with Agent Levesque again after

16   July 17th on July 21st?

17   A    Yes, sir.

18   Q    And gave him another interview; is that correct?

19   A    Probably, yes, sir.

20   Q    And in that interview you named a whole lot more

21   people, didn't you?

22   A    Possibly, yes.

23   Q    July 25th of 2009.  And in that interview you didn't

24   mention Stephanie Newton, did you?

25   A    I can't remember.

K. Newton - Cross

1    Q    And you didn't mention Thelma Welch, either, did you?

2    A    No.  If I had a copy of the files I could answer you.

3    Q    But you're being asked to tell about people that are

4    involved in drug trafficking or the selling or

5    distributing or the trading of drugs, and you're not being

6    honest, are you?

7    A    As much as I possibly can, yes.

8    Q    Now, sir, do you remember when you got a lawyer, and

9    what your lawyer's name was?

10   A    Couple different lawyers.

11   Q    Did you have Charlie Bledsoe for your federal case?

12   A    Yes, sir.

13   Q    And did you and Charlie Bledsoe meet with Mr. Lee and

14   Mr. Levesque and give what's called a proffer session?

15   A    Yes, sir, I believe that's what it's called.

16   Q    Did that happen on April 22nd of 2010?

17   A    I'm not sure.  Possibly, sir.

18   Q    And at that time were you asked to tell them

19   everything, everything you know about illegal use and

20   distribution of drugs?

21   A    Whatever I could think of at that time.

22   Q    And at that time, for the third time, you didn't

23   think of anything about Stephanie or Thelma, did you?

24   A    I'm not sure.

25   Q    Now, sir, do you remember your grand jury testimony

K. Newton – Cross

1   back some time ago?

2   A     No, sir, I don't.

3   Q     How about I give you a document here to refresh your

4   memory.

5   A     That would be great.

6   Q     Let me ask you this.  Did you, did you, sir, just say

7   that Stephanie Newton in your testimony had sold you or

8   given you some Xanax?

9   A     Xanax, blue Xanax.

10  Q     Blue Xanax?

11  A     Yes.

12  Q     And you said that she gave them to you for how much?

13  A     I believe it was two dollars apiece.

14  Q     All right, sir.  And how long did that go on?

15  A     A few months, is my recollection, yeah.

16  Q     I recall your testimony as two months.

17  A     A few months.

18  Q     Was it a few months?

19  A     I believe that's what I said.

20  Q     Okay.  Now, is that the way you testified in the

21  grand jury?

22  A     No, I do not remember.  That's why I'm asking you for

23  a copy of it.

24  Q     All right, sir.

25          MR. CHAFIN:  May I approach the witness?

K. Newton - Cross

```
 1              THE COURT:  You may.
 2   BY MR. CHAFIN:
 3   Q    If you would just begin your line 25, and continue on
 4   until the next page.
 5   A    "Yes, she is a nurse at the regional jail in
 6   Duffield."  "Did you ever provide, did she ever provide
 7   you with any?"  "Yes, sir."  "Did she ever provide you
 8   with information about law enforcement raids, or search
 9   warrants, or arrests that were coming down, or anything
10   like that?"  "She could possibly have.  I never did fool
11   with her too much.  I would get medication from her like I
12   get Xanaxes from the doctor.  She is a nurse, and she gets
13   Xanaxes.  I would get Xanaxes and Lortab."
14   Q    Now, stop right there.  That wasn't true, was it,
15   that you got Lortabs from her?
16   A    I believe I've got Lortabs from my other sister, not
17   this sister.
18   Q    Well, now, you just testified --
19   A    I know what I just said.
20   Q    You testified last year to one thing, and today
21   you're testifying to another; am I correct?
22   A    When you're being questioned about two people that
23   are sisters, and you don't know anything about it, I'm
24   sure you'd make a mistake like this.
25   Q    Go right on.
```

K. Newton - Cross

1    A    "Would she just give them to you?"  "No".  "Would she

2    sell them to you?"  "Yes."  "How much would she tell them

3    to you?"  "Three dollars for Xanax, $4 for Lortabs."

4    Q    Stop right there.  That's not what you said today?

5    A    Two different sisters, two different drugs.

6    Q    You're talking about Stephanie there, aren't you?

7    A    Talking about that's what this paper says, yes, sir.

8    Q    How can you get confused about sisters when you're

9    being asked just about one?

10   A    When you buy from 100 people, you don't pay attention

11   who you, how much you're paying for it, or who you're

12   getting it for.

13   Q    Was it $2 or $3?

14   A    It could be either one.  The prices on these pills

15   never stay the say.

16   Q    You really not sure?

17   A    I'm not, but I'm pretty positive.

18   Q    How often would that happen?

19   A    Every month.

20   Q    When did she start?

21   A    A couple years ago, whenever she started taking

22   Xanaxes.

23   Q    So, you say this was a couple years ago?

24   A    Yeah.

25   Q    Is that correct?  And that would have been a couple

K. Newton - Cross

```
 1    of years before this grand jury testimony that you were

 2    speaking of, correct?

 3    A    What?

 4    Q    I'll tell you, your grand jury testimony was

 5    June 15th of 2010?

 6    A    Right.

 7    Q    So, when you're saying that you were buying Xanax,

 8    and of course at that time you were saying Lortabs, too,

 9    from Stephanie Newton --

10    A    I don't remember her giving me Lortabs.  I remember

11    her distinctly giving me blue Xanaxes.

12    Q    You remembered it on June 15th?

13    A    I could have been wrong.

14    Q    When you were under oath?

15    A    Do what?

16    Q    You remembered it June 15th when you were under oath,

17    didn't you?

18    A    I guess I made a mistake.

19    Q    And today your recollection is that it's just the

20    Xanax, correct?

21    A    For the record to be clear, I did not buy no Lortabs

22    off of Stephanie.  She's never sold me Lortabs.  I never

23    know whether she got them from the doctor, or not.  The

24    other sister got Lortabs and Xanaxes.

25    Q    Let me ask you this, sir.  Was it two years before
```

K. Newton - Cross

```
 1    June 15, 2010 that this went on, or a few months?

 2    A    A few months.

 3    Q    Why did you say two years every month?

 4    A    I have no -- a few months -- what my testimony is.

 5    That is correct.

 6    Q    When did you decide to create your testimony that

 7    way, Mr. Newton?

 8    A    That's what I remembered right now.

 9    Q    But back on June 15th you remembered two years before

10    then every single month, didn't you?

11    A    I'm not sure what I remembered back then.

12    Q    That is what you testified to?

13    A    That's what the paper says.

14         MR. CHAFIN:  Judge, I'd like to offer this

15    excerpt of his testimony, it's about two pages and three

16    lines, into evidence.

17         THE COURT:  Yes, sir.  It will be admitted.

18    BY MR. CHAFIN:

19    Q    Stephanie Newton's --

20         THE CLERK:  Defendant's Exhibit Number One.

21         (Defendant's Exhibit No. 1 was received in evidence.)

22    BY MR. CHAFIN:

23    Q    Mr. Newton, do you even know how many felony

24    convictions you have?

25    A    No, sir, I don't.
```

K. Newton - Cross

1   Q    Just haven't kept up, have you?

2   A    No, sir, I haven't.

3   Q    And, but this last one has got a big sticker to it,

4   don't you?

5   A    Not much difference between this one and the others.

6   Q    Well, 22 years is the big difference.  You've never

7   really done any real time?

8   A    Yes, I have.  Check my record.

9   Q    What's your longest sentence?

10  A    They give me 87 years back in 1995.  I've done about

11  nine and a half years on it, close to ten years.  I don't

12  know.  Have I done any time?

13  Q    Now, you and James, let's talk about your trip to

14  Ohio.

15  A    Yes, sir.

16  Q    You and James kept that a secret from Stephanie,

17  didn't you?

18  A    I have no idea whether he kept it secret from her, or

19  not.  I never asked him.

20  Q    You knew he wouldn't take her calls?

21  A    What?

22  Q    You knew he wouldn't take her calls?

23  A    What calls?

24  Q    Telephone calls.

25  A    Why didn't he?

K. Newton - Cross

1   Q     Did you know that, or did you not know that?

2   A     They talked several times while we was there.

3   Q     So, they were talking on the phone?

4   A     Yeah, someone's phone, yes.

5   Q     And were they talking when you got to, with Sheila

6   and with Connie?

7   A     No, I believe I had Sheila make a phone call for me

8   to get the phone number for me for him.  When I got to

9   town and called him.

10  Q     But you testified that Stephanie and James Crabtree

11  were talking on the phone.  Were they talking on the phone

12  once you got to Ohio?

13  A     No.

14  Q     Uh-huh.

15  A     It was bad when he talked to her a couple of times, I

16  believe.

17  Q     Now, your sister, Stephanie, has never approved of

18  your use of drugs, has she?

19  A     I have no idea.  I don't think so.

20  Q     Well, hasn't she told you and told you and told you

21  not to be doing this?

22  A     Yeah, that's what she said.

23  Q     Isn't that what she says?

24  A     Yeah.

25  Q     Trying to get you straightened up?

K. Newton - Cross

1   A     Yeah.

2   Q     I mean, that's the truth, isn't it?

3   A     That's what she says.

4   Q     And you just never did it, did you?

5   A     No, never did it.

6   Q     And about this issue of using her as a go between,

7   you were using Stephanie Newton as a go between in that

8   conversation, weren't you?

9   A     Go between who?

10  Q     We'll talk about the conversation about the shiny

11  silver thing.

12  A     Yeah.

13  Q     If you want somebody to know what you're talking

14  about, why don't you just come out, if you want to be sure

15  that they know what you're talking about, why don't you

16  speak in the plain queen's language, English?

17  A     Possibly so I wouldn't have a charge for a gun, that

18  I didn't need a charge for.  My sisters are used to being

19  around drug dealers, thugs.  They understand this

20  language.  They should have understand it.  If they don't,

21  then there's something wrong.

22  Q     If they don't -- but you don't know for sure, do you,

23  sir?  You never had a conversation with Stephanie about a

24  gun, did you?  You never talked about a gun with her, did

25  you?

K. Newton - Cross

1  A    If it's on the transcript, then I talked to her about

2  it.

3  Q    You don't remember, do you?

4  A    No, I don't remember.

5  Q    And, but you want her to -- I mean, you, for many,

6  many years, you've called them and you wanted them to do

7  this, or do that, because you've been in prison?

8  A    I never told them to do anything for me the years I

9  was in prison except this time.

10  Q    You said that this money that James Crabtree had was,

11  was a gift to him?

12  A    I believe.  That might be what he told me.

13  Q    And you know that your sister was head over heels for

14  James Crabtree, don't you?

15  A    It don't sound like she was.

16  Q    Well, she just had two of his children, didn't she?

17  A    That's what, what the problem is, I believe.

18  Q    She had a little baby any her arms, didn't she?

19  A    Yes, sir.  That don't mean you're head over heels in

20  love with somebody.

21  Q    In the meanwhile, while you're talking to her and

22  you're talking about this liquid morphine, you're lying to

23  Stephanie about that, too, aren't you?

24  A    Absolutely.

25  Q    You're lying to her?

K. Newton - Cross

```
 1   A      Absolutely.

 2   Q      You just testified earlier that you knew James was

 3   doing that liquid morphine, but when you were talking to

 4   Stephanie Newton on the toll phone you were just lying to

 5   her?

 6   A      Was I supposed to say, "Yeah, he's a strung out

 7   junkie.  You don't need him.  He's a bum.  Get rid of

 8   him."

 9   Q      You don't know how to tell the truth; you just say

10   what you want to say, don't you?

11   A      I wouldn't want to hurt her with the truth.  She's a

12   big girl.  She knows the truth.

13   Q      Mr. Newton, you've never had a career at anything but

14   drug stuff, have you?

15   A      Drug dealer.

16   Q      Right.  I mean, you've never, you've never worked a

17   job, have you?

18   A      I've worked a few jobs.

19   Q      But you've never really paid taxes, or done any of

20   those things, have you?

21   A      Few times.

22   Q      But not regularly?

23   A      No.

24   Q      What time you weren't, you were slinging drugs?

25   A      Working and slinging drugs, yes.
```

1   Q    But now you expect after all this deceitfulness and

2   lying, cheating and drug dealing and dishonest ways that

3   we're supposed to believe you?

4   A    Yes, sir, I do.

5   Q    That's what I thought.  Thank you.

6           THE COURT:  All right.  Mr. Dene, do you have any

7   questions?

8           MR. DENE:  No questions, Your Honor.

9           THE COURT:  All right.  Mr. Lee, any questions?

10                  REDIRECT EXAMINATION

11  BY MR. LEE:

12  Q    Mr. Newton, you were asked a lot of questions about

13  your work with the ATF after you were first arrested in

14  July?

15  A    Yes, sir.

16  Q    You don't deny you were playing both sides of the

17  fence, do you?

18  A    No, sir.

19  Q    You were giving Agent Levesque information and you

20  were selling dope on the side?

21  A    Not much, but yes, I had to.  I couldn't make it

22  work.

23  Q    You don't deny it?

24  A    No.

25  Q    And you were using, too?

K. Newton - Redirect

```
 1   A     Yes, sir, a little bit I was.

 2   Q     Now, a lot has been said about sentence reduction,

 3   and you getting your sentence reduced.  Do you understand

 4   who makes the final reduction?

 5   A     I think it's the judge.

 6   Q     It's the judge, isn't it?

 7   A     Yeah.

 8   Q     Even if I made a motion to reduce your sentence, it's

 9   still in the hands of Judge Jones?

10   A     Yes, sir.

11   Q     He could just say you don't deserve anything?

12   A     I believe that might be what he thinks.

13   Q     Based on the fact he's given you 22 years to serve

14   already?

15   A     Yes, sir.

16   Q     Now, when you were first arrested in July of 2009 you

17   sat down on two different occasions a couple days apart to

18   talk to Agent Levesque, correct?

19   A     Yes, sir.

20   Q     What was he asking you about?

21   A     About drug deals, guns, explosives.  He was looking

22   for some weapons that had been stolen.  I didn't have much

23   knowledge of it at that time, but I was trying to locate

24   them, drug deals, put everything together, as much

25   information as I could possibly obtain or come up with,
```

K. Newton – Redirect

```
 1   and I was trying to put a couple of major deals together
 2   for him in hopes that it might help me along where I just
 3   got busted, and the farther I got into the situation,
 4   trying to work on it, the worse things went for me.  It
 5   got out of control.  It's impossible to go ahead, it
 6   wouldn't work, and I failed.
 7   Q    That's July, though?
 8   A    Yes, sir.
 9   Q    You hadn't gone to Ohio yet, and taken thousands of
10   dollars of money up there to buy drugs?
11   A    No.
12   Q    So, you couldn't have told Agent Levesque about that?
13   A    No, it just started on things happening.
14   Q    And in your grand jury testimony in July of 2010, how
15   long have you been locked up at that point?
16   A    In July?
17   Q    July of 2010?
18   A    Since the day I got busted in October of 2009?  Yes,
19   sir.
20   Q    It's almost a year?
21   A    Yes, sir.
22   Q    So, if you told in the grand jury that it had been
23   about two years ago that you were buying Xanaxes --
24   A    From my sister.
25   Q    From your sister.  Did you ever take a few months
```

K. Newton – Redirect

1   here or there?

2   A     About two years.

3   Q     About two years before that?

4   A     She couldn't be selling them to me for two years,

5   because I don't think she got them for two years.

6   Q     She was prescribed Xanax?

7   A     Yes, sir.

8   Q     How did you know that?

9   A     I seen her bottle when I got them from her.

10  Q     Finally, Mr. Chafin was clear, clearly asked that you

11  lied to Ms. Newton when you were talking about liquid

12  morphine.  You said you did?

13  A     Pardon me?

14  Q     When you were talking to Ms. Newton on the phone

15  about the liquid morphine and whether or not you knew

16  about James Crabtree using liquid morphine?

17  A     Right.

18  Q     You admit you lied to her?

19  A     On the phone calling?  She knew I was lying.

20  Q     You could hear her on the phone saying she was, he

21  was using liquid morphine?

22  A     I was trying to keep them from fighting.

23  Q     She told you on that phone call because she knew all

24  about it?

25  A     It wasn't a lie.  It was just something that

K. Newton – Redirect/Recross

 1  happened.

 2  Q    She told you she knew he had been using it at your

 3  house?

 4  A    Right.

 5  Q    Later on when she was asked about if she denied it,

 6  she would be lying, wouldn't she?

 7  A    Yes.

 8          MR. LEE:  No further questions.

 9          THE COURT:  Anything further of this witness?

10  All right.  Thank you, sir.  You may step down.  You can

11  give that back to Mr. Lee.

12          MR. CHAFIN:  Judge, may I ask one final question?

13          THE COURT:  Yes, sir.  Wait just a second, sir.

14  We need you to go back.

15          MR. CHAFIN:  I apologize.  Something came to me.

16          THE COURT:  Yes, sir.

17                RECROSS EXAMINATION

18  BY MR. CHAFIN:

19  Q    Mr. Newton, I don't guess you saved any of those

20  Xanax to show this jury, did you, that you say that you

21  bought off my client?

22  A    I told you I ate them and sold them.

23  Q    And I don't guess you saved any of those Lortabs that

24  you got off of your sister, Thelma, either to show to this

25  jury?

K. Newton – Recross

1   A     No, sir, I didn't.  I ate them and I sold them.

2   Q     It's just your word for it, isn't it, sir?

3   A     That's all I have.

4   Q     All right.

5             THE COURT:  Anything further?  Thank you, sir.

6   You may step down.  Ladies and gentlemen, we're going to

7   end our trial day at this time.  It will be necessary for

8   you to return tomorrow morning.  Please be here by 9:00 so

9   we can begin promptly.

10      Now, please remember my instructions to you about not

11  discussing this case with anyone, or having it discussed in

12  your presence.  When you go home, your family members may

13  ask you to tell them all about the case.  But just tell

14  them the judge told you not to talk about it now; you'll

15  tell them about it when it's all over.  But it's important

16  that you decide this case based on the evidence that you

17  hear in the courtroom, and not on what somebody else might

18  think.  I know you'll follow my instructions.

19      Drive carefully, have a good evening, and we'll see

20  you at 9:00 in the morning.  If you'll leave your notebooks

21  in the jury room, they'll be safe in there.

22      (The jury retired to the jury room, after which the

23  following occurred:)

24             THE COURT:  Counsel, is there anything we need to

25  take up before we adjourn for the evening?  If not, I'll

1    see everyone at 9:00 in the morning.  Court is adjourned.

2         (Proceedings concluded at 6:10 p.m.)

3

4

5

6

7

8                         CERTIFICATE

9

10        I certify the foregoing is an accurate transcript

11   from the record of proceedings in the above-entitled

12   matter.

13

14

15   4/10/11
     Date                        /s/ Bridget A. Dickert
16

17

18

19

20

21

22

23

24

25